Paul J. **HEIDEMAN**, Appellant,

v.

**UNITED STATES of America.**

No. 14414.

United States Court of Appeals
District of Columbia Circuit.

Argued June 27, 1958.

Decided Sept. 25, 1958.

Petition for Rehearing En Banc Denied
Nov. 17, 1958.

Mr. Walter E. Gillcrist, Washington, D. C. (appointed by the District Court), for appellant.

Mr. Louis M. Kaplan, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher and Joel D. Blackwell, Asst. U. S. Attys., were on the brief, for appellee.

Before MADDEN, Judge, United States Court of Claims,* and BAZELON and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appellant, convicted of robbery, challenges admission of a confession, and the trial court's instructions on the law of robbery. On the night of October 24, 1957, a taxicab driver was struck over the head by one of his two passengers and robbed. The following morning, Detective Conley, assigned to the case, learned that the passengers, identified as sailors, had boarded the cab about 11:00 p. m.; that they had directed the driver to take them to the 2200 block of T Place, Southeast; that in conversation the driver heard them mention the name "Skylark Restaurant"; Conley also learned that on the prior evening seven sailors had been at that restaurant and that during the evening one of them had been arrested by the Armed Services police; the arrestee was attached to the U.S.S. Tallahatche, then docked in Washington.

Detective Conley went to the ship, and from the arrested sailor learned the names of the six others who were at the Skylark on the previous evening. At that time he confronted five of the sailors and asked each of them if they knew anything about a taxi driver being held up the previous night. Each, including appellant and his codefendant Brennan, replied in the negative. He further learned that two of the seven sailors had left the restaurant at about 10:40 p. m., and that these two were appellant and co-defendant Brennan. Detective Conley further developed that the walking time from the restaurant to the intersection where the cab had been hailed was about 15 minutes. He also ascertained that appellant knew the sister of a sailor on the ship, and she lived in the 1900 block of T Place, Southeast.

On the basis of the above information, the Armed Services police on the same day (October 25) brought the appellant and Brennan from the ship to police headquarters, and turned them over to Conley in the Robbery Squad office at about 3:00 p. m.

When the two defendants were brought into the Robbery Squad office, Detective Conley took Brennan back to a rear room (the Captain's office) for the purpose of interrogating him. Conley first asked Brennan what he knew about the robbery, and Brennan denied any knowledge of it. Conley presented what he had learned from his investigation; Brennan then admitted being present and riding in the front seat of the taxi, and that he had pulled on the emergency brake before fleeing after the driver had been struck

---

* Sitting by designation pursuant to the provisions of Sec. 291(a), Title 28 U.S. Code.

by another person. Brennan's questioning began at about 3:05 and lasted 10 or 15 minutes. While Brennan was being interrogated, appellant remained out in the main section of the squad room, out of earshot, but in sight of Conley and Brennan. During this interval he was not questioned.

Conley then summoned appellant to his desk and asked him what he knew about the robbery. Appellant denied knowing anything. Conley told him what Brennan had said, but appellant denied knowledge. Conley asked appellant if he wanted to hear Brennan tell his own story, and he said he did. Brennan was then called in, and he repeated his story to appellant, but appellant still maintained he knew nothing of the robbery. Conley then commenced to type up papers for the arraignment of both suspects before a U. S. Commissioner. When he had almost completed the papers on appellant, he asked him whether he wished to make any further statement, at which point appellant confessed to the crime, saying he had sat in the back seat of the taxi and had struck the driver with a sock filled with gravel. The time was now between 3:30 and 3:45. Separate interrogation of the two suspects had covered a total of 25 to 30 minutes, allowing some time for preparation of arraignment papers by the detective. Appellant and Brennan were then booked, photographed and fingerprinted, and at about 4:10 or 4:15, barely one hour after arrest, as we have noted, they arrived at the U. S. Commissioner's office and were arraigned. The total elapsed time between

arrest and confession was not less than 30 minutes nor more than 45 minutes. Within 30 minutes from the confession appellant was arraigned.

### I—Admissibility of Confession

■ At trial, appellant objected to Detective Conley's testimony as to the oral confession, and after a hearing, the trial court held it admissible. We find on this record there was no "unnecessary delay" between appellant's arrest and his arraignment,[1] and hold that the voluntary statements made to Detective Conley were admissible. Obviously, in a short time interval, there is less likely to be "unnecessary delay" than if a longer period elapses, but judicial evaluation of whether the "delay" was necessary or "unnecessary" must be made on the basis of all the circumstances. Delay after a confession is less crucial than delay before a confession. Here the time elapsed between commencement of the interviews (3:15 or 3:20) and arrival at the arraigning authority (4:10 or 4:15) was so brief that we can fairly say that it was spent in ordinary and necessary police administrative procedures. The time lapse from the commencement of appellant's interrogation to his oral confession was between 10 and 20 minutes. Yet we need not rely on presumptions for the evidence affirmatively shows there was nothing more than appropriate inquiry to make sure that the police were not charging the wrong persons.[2]

At the outset, the police, assuming they have probable cause for arrest, are entitled to ask the arrested suspect what

1. See Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; Mallory v. United States, 104 U.S.App. D.C. ——, 259 F.2d 796; Trilling v. United States, 104 U.S.App.D.C. ——, 260 F.2d 677.

2. Cf. Metoyer v. United States, 1957, 102 U.S.App.D.C. 62, 250 F.2d 30. The "delay" here is plainly distinguishable from that which occurred in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, supra note 1: here the elapsed time is readily accounted for by the necessary administrative steps together with the very brief

and separate interrogations of two men— all in the space of barely an hour. In the Mallory case, contrariwise, an afternoon and entire night separated arrest from arraignment, and the time was intermittently used for extensive interrogation of the accused, including use of a lie detector test and simultaneous questioning by a number of officers. In the pre-arraignment interval there, more occurred than the mere handling of administrative details and the corroborating of the accused's identification.

he knows about a crime.[3] If he denies knowledge, they are entitled to state to him what evidence they have and ask whether he cares to comment upon it. A strong circumstantial case which would satisfy the U. S. Commissioner, prima facie, might well be explained away by a suspect who knew what information the police relied on—hence leading to no charge being made. If the suspect continues to deny knowledge, the police are entitled to conclude the interview by saying, in effect, "Do you have anything further to tell us, or do you just want to let it stand the way it is?" which was what Detective Conley asked appellant. Such questions as these the police may ask—indeed *should* ask; it is only when the questioning crosses into what can be termed "grilling," or is continued beyond the brief period allowed, that the resulting confession may be held inadmissible.

The record shows the time interval here was consumed only by the questions outlined above, and by the preparing of papers, booking, photographing, fingerprinting and transportation, all of which are not only proper activities but necessary.

3. Cf. Metoyer v. United States, supra note 2.

4. Bishop v. United States, 1939, 71 App. D.C. 132, 107 F.2d 297; Respublica v. Weidle, 1781, 2 Dall. 88, 2 U.S. 88, 1 L.Ed. 301; Coke Inst. 247; cf. Penitential of Theodore (c. 690 A.D.), quoted in Singh, History of the Defence of Drunkenness in English Criminal Law, 49 L.Q.Rev. 528 (1933).

5. See, e. g., Edwards v. United States, 1949, 84 U.S.App.D.C. 310, 172 F.2d 884 (drunkenness relevant in trial for housebreaking and larceny); United States v. Bowen, C.C.D.C.1835, 24 Fed. Cas. p. 1207, No. 14,629 (burglary); but see Proctor v. United States, 1949, 85 U.S.App.D.C. 341, 177 F.2d 656 (drunkenness irrelevant in trial for unauthorized use of an auto).

6. See, e. g., Bishop, Criminal Law § 408 (1923); Burdick, Law of Crime § 168 (1946); Wharton, Criminal Law & Procedure § 44 (1957).

## II—*Intoxication as Defense*

The second question is whether the trial court should have instructed the jury to return a verdict of not guilty if it found that appellant was so intoxicated as to be incapable of forming the intent to rob. The appellant asked for such an instruction, but the trial court denied it.

 Drunkenness is not per se an excuse for crime,[4] but nevertheless it may in many instances be relevant to the issue of intent.[5] One class of cases where drunkenness may be relevant on the issue of intent is the category of crimes where specific intent is required.[6] Robbery falls into this category, and a defendant accused of robbery is entitled to an instruction on drunkenness as bearing on intent if the evidentiary groundwork has been adequately laid. Such an instruction is necessary, however, only if sufficient evidence on the intoxication issue has been introduced so that a reasonable man could possibly entertain a doubt therefrom that the accused was able to form the necessary intent.[7] The record before us does not reveal such a case.[8] Drunkenness, while efficient to reduce or remove *inhibitions*,[9] does not readily negate *intent*.[10]

7. See Edwards v. United States, supra note 5; see also Brenan v. Commonwealth, 1945, 183 Va. 846, 33 S.E.2d 639.

8. The evidence as to drunkenness showed no incapacitating state of intoxication; co-defendant Brennan testified that "I didn't consume enough that I was beyond the point that I didn't know what I was doing; but [appellant] got a little drunker than me * * *." Also, "[appellant] had quite a bit to drink, quite a bit more than me." On the other hand, the record reveals such statements as "he wasn't that drunk," and "you could tell they had been drinking, but they weren't what you would call drunk or intoxicated."

9. See Hall, Intoxication and Criminal Responsibility, 57 Harv.L.Rev. 1045, 1078 (1944); Note, Intoxication as a Criminal Defense, 55 Colum.L.Rev. 1210, 1211 n. 6 (1955).

10. In first degree murder trials, the degree of drunkenness need not be so great. In addition to intent, first degree murder re-

Appellant's careful advance preparation for the crime, before boarding the cab, by filling a sock with gravel to use as an efficient but silent weapon with which to render the cab driver helpless, the rifling of his pockets and taking of his wallet show that appellant's mind was working logically, rationally and efficiently to the execution of his criminal purpose. We might add to that the not insignificant fact that the seating arrangement, with Brennan in the front seat ready to apply the brake, and appellant in the rear seat where he could more readily use his "sandbag" on the victim, like the other carefully calculated steps, including prompt flight, is not the work of a man so intoxicated as to be unable to form the intent to rob. We hold that the evidence in this case could not create a reasonable doubt in the mind of any reasonable man as to whether appellant possessed the requisite intent as to each element of the crime of robbery.[11]

Affirmed.

BAZELON, Circuit Judge (dissenting).

I agree with the majority that "a defendant accused of robbery is entitled to an instruction on drunkenness as bearing on intent if the evidentiary groundwork has been adequately laid." I cannot, however, agree with the majority that the evidentiary groundwork was lacking in the instant case.

In Brenan v. Commonwealth, 1945, 183 Va. 846, 33 S.E.2d 639, 640, cited by the majority in support of its holding, the evidence showed that the defendant had drunk "some beer" and had with him nearly four quarts of whiskey and, in the opinion of a policeman, "had been drinking but * * * was not drunk." That evidence was, of course, clearly inadequate to require the instruction.[1]

The evidence we described in Edwards v. United States, 1949, 84 U.S.App.D.C. 310, 172 F.2d 884, as "strongly tending to show that appellant was drunk when the acts were done," so as to require the instruction, consisted of the appellant's testimony that she had consumed large quantities of alcoholic drink and the testimony of police officers that, in their opinion, she was not drunk.[2] The question of the degree of intoxication as affecting the formation of intent was held, on this evidence, to be one for the jury under a proper instruction.

The testimony on the question of intoxication in the instant case came largely from co-defendant Brennan. He testified:

"We consumed quite a bit of whiskey, but I didn't consume enough that I was beyond the point that I didn't know what I was doing; but Heideman got a little drunker than me * * *.

* * * * * *

"Q. You say Heideman was drunk? A. Yes, sir; he had quite a bit to drink, quite a bit more than me.

"Q. But you mean to say he didn't know what he was doing? A. I wouldn't say what [sic] he knew what he was doing. I couldn't speak for him."

The victim of the robbery, on the other hand, testified that "you could tell they [appellant and Brennan] had been drinking, but they weren't what you would call drunk or intoxicated."

quires deliberation and premeditation, and drunkenness may more readily negate these elements, and may thus reduce the degree of the offense. See, e. g., Hopt v. People, 1881, 104 U.S. 631, 26 L.Ed. 873; Bishop v. United States, 1939, 71 App. D.C. 132, 107 F.2d 297; Sabens v. United States, 1913, 40 App.D.C. 440.

11. Cf. Jordan v. Commonwealth, 1943, 181 Va. 490, 25 S.E.2d 249; Ryan v. United States, 1905, 26 App.D.C. 74; State v. Bruno, 1918, 141 Minn. 56, 169 N.W. 249.

1. Moreover, the court said that the instruction is not required by Virginia law even when there is an adequate evidentiary basis. 33 S.E.2d at page 640.

2. See Records and Briefs, United States Court of Appeals, D.C., Vol. 775, Case No. 9907, Brief for Appellee, pp. 2, 57–58.

The evidence in this case, just as the evidence in Edwards, created an issue as to whether there was such drunkenness as to negate intent. Just as in Edwards, I think, that issue was one for the jury to determine. The trial judge denied the requested instruction on the theory, which this court now holds was erroneous, that "robbery, unlike larceny, does not require a specific intent." He did not, like my brethren, deem the evidence insufficient to permit the jury to entertain a reasonable doubt as to appellant's ability to form an intent to commit robbery. He simply thought that the degree of intoxication was irrelevant. He told the jury:

"The defendant Brennan further testified that both he and Heideman were intoxicated and apparently he would infer that neither one of them knew what they were doing.[3] He also denies that he saw Heideman put the gravel in his sock.

"Now, the taxi driver testified that when the two sailors got into his cab they were not drunk. He said they evidently had been drinking, but they were not drunk. So, as far as this case is concerned, ladies and gentlemen of the Jury, it makes no difference whether they were intoxicated or not, because the law is that intoxication is not an excuse for the commission of a crime. The law does not recognize intoxication as a defense to a criminal charge. You can see a good many reasons for that rule of law, because if the rule were otherwise any one could drink to excess and then go out and commit a crime without fear of punishment. That would be intolerable."[4]

This instruction was clearly wrong, even under my brethren's view.

As the majority points out, one can conclude from the circumstances of the crime that appellant was not too drunk to have intended to rob the victim. But that conclusion was one to be drawn by the jury under a proper instruction, not by an appellate court.

In my opinion the judgment must be reversed because the charge to the jury on the question of intoxication was erroneous and because the refusal to give the instruction requested by appellant was equally erroneous.

Another ground for reversal, in my opinion, is the admission in evidence of appellant's confession.

The record shows that, at 4:25 P.M., on October 25, 1957, appellant and co-defendant Brennan were brought before the United States Commissioner under Rule 5(a), Fed.R.Crim.P., 18 U.S.C.A., on a complaint charging robbery and the following proceedings were taken:

"Complaint prepared. Ea. Defendant was informed of the complaint and of his right to have a preliminary hearing and to retain counsel. Defendant was not required to make a statement and was advised that any statement made by him may be used against him. Each Defendant was advised of his right to cross-examine witnesses against him and to introduce evidence in his own

---

3. As may be seen from his testimony quoted above, Brennan did not say that he did not know what he was doing. He did, however, suggest that *appellant* may have been too drunk to know what he was doing.

4. At the beginning of the trial, the judge served notice on appellant's counsel that he would refuse the requested instruction, which may account for the fact, though it does not excuse it, that appel-

lant himself offered no evidence of his intoxication. The judge said:

"I will have to instruct the jury that intoxication is not a defense. I have no patience with intoxication anyway. Many people get drunk but when honest people get drunk they do not go out and commit crimes. In other words, you could say if a person committed a crime while drunk he must have a criminal instinct in him because they say, as you probably know, that in a state of intoxication a person exhibits his true desires."

behalf. Each def. waived preliminary hearing."[5]

Over six hours earlier, at about 10:00 A.M., a police officer had gone to the defendants' ship and had there questioned Brennan. Whether he had also questioned appellant at that time does not appear. At any rate, he arranged with the Armed Services Police to have both defendants arrested and brought to the Robbery Squad and, at about 3:00 P.M., they were brought there and turned over to the police.

The police do not claim to have informed the defendants, either on the ship or at the police station, of the rights which the Commissioner later advised them they had. They proceeded, however, to question both prisoners at the police station. The prisoners were questioned separately. Each, on the first questioning about the robbery, denied knowing anything about it. After a few minutes of questioning, in the course of which the police informed Brennan of the evidence they had, he confessed. Then they commenced questioning appellant. He said he knew nothing about the robbery. They continued questioning him, however, first informing him that Brennan had already confessed and then bringing Brennan back in to repeat his confession in appellant's presence. Appellant persisted in his claim of innocence. After typing up the complaint form for presentation to the Commissioner, the police asked appellant once more whether he was willing to confess. He then did confess. The entire questioning process at the police station took no more than 45 minutes. How long the police had questioned either or both prisoners in the morning on the ship does not appear from the record. Nor does the record show whether or not the Armed Services Police had questioned them before bringing them to the police station at 3:00 P.M.

The police may, of course, question any suspect before arrest. The shipboard questioning at 10:00 A.M. was such permissible pre-arrest questioning. Once arrested, however, the suspect is entitled to be arraigned before a magistrate who will inform him of his rights and make an adjudication of the Government's right to hold him. He is not to be taken to the police station for "a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt." Mallory v. United States, 1957, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479. The officer who questioned these prisoners testified that they had been brought to him "for some purpose of interrogation." The confessions were, therefore, inadmissible under Trilling v. United States, 104 U.S. App.D.C. ——, 260 F.2d 677.

My brethren say, in effect, that it is proper for the police, before presenting an arrested person to a magistrate for a preliminary hearing under Rule 5, Fed. R.Crim.P., to conduct a preliminary hearing of their own in order to satisfy themselves that they have the right man. If, in such a "hearing," the police satisfy themselves that he is the right man by obtaining a confession from him, my brethren say the confession is admissible so long as the questioning did not cross into "grilling." This makes a farce of the carefully designed procedures prescribed by Rule 5. The rule is designed to insure that the prisoner will be advised of his rights by a judicial officer before—not after—the police have had the opportunity to impose upon his ignorance and fear. The Supreme Court said of the defendant in Mallory: "Not until he had confessed, when any judicial caution had lost its purpose, did the police arraign him." 354 U.S. at page 455, 77 S.Ct. at page 1360. Apparently my brethren now find the procedure condemned in Mallory to be not only proper but desirable. They say such procedure is actually for the benefit of the arrested person because it gives him a chance to avoid being formally charged before a magistrate. I think it is the height of

5. Record of proceedings before the Commissioner.

irony that the arrested person's greatest protection—his right to be brought before a magistrate under Rule 5—should be treated as an evil to be avoided. My brethren "protect" the accused by authorizing the police to question him secretly and to induce him to confess while he is ignorant of his rights and is in the state of fear produced by police control and domination.