Thomas H. BELL, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–1131.

District of Columbia Court of Appeals.

Argued May 24, 2006.
Decided June 12, 2008.

Judith A. Lovelace, Suitland, MD, for appellant.[1]

Stratton C. Strand, Assistant United States Attorney, for appellee. Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., James S. Sweeney, and Edith M. Shine, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and SCHWELB, Senior Judge.[2]

RUIZ, Associate Judge:

Appellant was convicted of armed robbery, possession of a firearm during a crime of violence (PFCV), and possession of a prohibited weapon with the intent to use it unlawfully (PPW). On appeal, he claims that the trial court violated his right to present a defense by 1) allowing a proffered defense witness to invoke his Fifth Amendment privilege without taking the stand; 2) refusing to admit that witness's purported confession, exculpating appellant, as a statement against penal interest; 3) denying his request to instruct the jury on voluntary intoxication, and 4) barring as untimely his attempt to present an insanity defense. In addition, appellant argues that the trial court erred in failing to instruct the jury on assault as a lesser-included offense of armed robbery and allowing appellant to waive his right to counsel. Lastly, he argues that the two weapons convictions merge. Having considered the arguments and reviewed the record, we affirm.

## I. Statement of Facts

The government's evidence at trial established that appellant robbed a Payless Shoe Store on Minnesota Avenue, Northeast, at 11:45 a.m. on March 22, 1999, and then escaped in a getaway car, a dark blue Cadillac, driven by Ricardo Riley. Appellant was apprehended when the car was pulled over by the police seven blocks away, just minutes after the police received a call about the getaway car from witnesses who had seen the robber run to a waiting "black Cadillac." Appellant attempted to flee, but the police officers were able to stop and arrest him. The officers found that appellant had the shoe store's security camera, a BB gun matching the store employees' description of the

---

1. Appellant's first court-appointed appellate attorney, Reginald M. Sealey, filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), seeking to withdraw from the representation. The court granted counsel's motion to withdraw, and by order dated March 26, 2002,

Ms. Lovelace was appointed to represent appellant.

2. Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

weapon brandished by the robber, and money that matched nearly exactly the amount stolen from the store, including rolls of coins that the employees identified as money the robber had taken. Additionally, the police recovered from the Cadillac a "dark thin panty hose with a knot tied in the top" from behind the passenger's seat, which fit the store employees' description of what the robber wore over the top half of his face during the robbery. Appellant was positively identified by two store employees, including the one whom he robbed, based on his clothing, boots and glasses. The employees testified that appellant had demanded an employee to remove the security camera from the wall and give it to him, ordered the employees and a customer to the back of the store, and told them to take their clothes off.

Appellant took the stand in his own defense. He testified that he had been living on the streets and had been dropped off by Riley at a friend's apartment, a crack house, "to chill out, buy drugs and just get myself together." According to appellant, he suffers from paranoia and has hallucinations. He does not take his prescribed medications, but rather "self-medicates" with marijuana and PCP to stop hearing voices. On the morning the police arrested him, he had smoked "three to four blunts" of marijuana laced with PCP and had drunk shots of "Remy" and beer. Appellant denied that he robbed the store. He said that he was in the car with Riley, who had come by to pick him up and, according to appellant, was driving the wrong way on Minnesota Avenue when they were stopped by the police. Appellant denied that he tried to flee, and explained that he had disobeyed the police officer's order to stay inside the car because he needed some air. He also denied that he had any of the store's property. He said that the shoes introduced as evidence by the government were not his—he had been wearing boots—but that they were shoes he had been forced to wear at the police station. The defense introduced a picture of appellant taken on the day of the robbery which showed him having a "fade haircut," and a thin mustache.

## II. Right to Present a Defense

### A. Invocation of the Fifth Amendment by Appellant's Proposed Witness

During trial, appellant said that he would like to call Riley, the driver of the Cadillac, to testify. At the time, Riley (who was tried separately) had already been convicted of the armed robbery and sentenced, but his appeal was pending. Riley's counsel, who was present, informed the trial court that Riley did not wish to speak with appellant regarding any potential testimony he might give on his behalf; did not wish to testify on appellant's behalf; and, if called, would invoke his Fifth Amendment privilege against self-incrimination. When the trial court inquired into the nature of Riley's potential testimony, Riley's counsel responded that "it would not be anything exculpatory on behalf of Mr. Bell if he were forced to testify." Counsel noted that Riley's defense in his own case was one of duress—that appellant jumped into Riley's car after robbing the Payless Shoe Store, pulled a gun on Riley, and forced Riley to drive away. Riley's counsel stated that "that would closely be what his testimony would be if forced to testify." The government advised the court that it would not grant Riley immunity even if he were willing to testify on appellant's behalf, since Riley's appeal was pending and there remained the possibility of a retrial.

Appellant's counsel proffered, on the other hand, that Riley would testify that he had told appellant to "keep quiet," that he knew appellant did not commit this

crime and that, if Riley were asked, "he would say so." According to appellant's counsel, Riley had told appellant that, if asked, Riley would "take his own weight," meaning he would "take his own charge," and "confess to his own culpability." Riley purportedly said this to appellant while they were sharing a cell at D.C. Jail, before Riley's trial.

The trial court relied on the representation of Riley's counsel that Riley would not testify favorably for appellant, and noted that Riley's "position now that he will not provide exculpatory information is completely consistent with the evidence that came in during [Riley's] trial." Therefore, the trial court ruled that it would not compel Riley to testify, since his testimony would not be "clearly exculpatory." The court denied appellant's request to make further inquiry of Riley.[3]

■ "Our review of a trial judge's decision authorizing a defense witness' invocation of the privilege against self-incrimination may implicate questions both of fact and of law." *Littlejohn v. United States*, 705 A.2d 1077, 1082 (D.C.1997). "As in other comparable situations, we accord deference to the trial judge's findings of historical fact and to [her] first-hand assessment of the realities of the situation before [her]." *Id.; see* D.C.Code § 17–305(a) (2001)). "We apply the non-deferential *de novo* standard, on the other hand, to the trial judge's conclusions of law." *Id.*

■ When a potential defense witness refuses to testify by invoking the Fifth Amendment privilege, the court must first determine whether the testimony would, in fact, be incriminatory and thus create the possibility of future prosecution. *See Car-*

ter v. United States, 684 A.2d 331, 344 (D.C.1996) (en banc). If so, the Fifth Amendment claim is valid. *See id.* In making this determination, when the privilege is invoked "by someone other than the defendant, the court must ordinarily permit examination of the witness ... one question at a time." *Brown v. United States*, 864 A.2d 996, 1004 (D.C.2005) (quoting *Harris v. United States*, 614 A.2d 1277, 1282 (D.C.1992)). A detailed examination "is designed to prevent witnesses from attempting to excuse themselves altogether from testifying by claiming a blanket Fifth Amendment privilege." *Id.* However, "when the witness does not make such a blanket claim, there is usually no need for the court to follow a question-by-question procedure (although the court, of course, may do so if it is appropriate for some other reason)." *Id.* We have noted that "trial judges often rely on proffers by counsel instead of a formal questioning procedure to make privilege determinations. We have never forbidden the practice of relying on proffers in such situations...." *Id.*

■ If the invocation of the Fifth Amendment privilege is valid, it must be respected. *See Carter, supra,* 684 A.2d at 344. But the court should inquire of the government about the possibility of a grant of use immunity to the defense witness, in order to accommodate the witness's Fifth Amendment privilege and the defendant's Sixth Amendment right to present a defense, if the defendant establishes that the witness's proposed testimony is (a) material, (b) clearly exculpatory, (c) non-cumulative, and (d) unobtainable from any other source. *See id.* Appellant

---

3. Defense counsel later stated that he was not necessarily requesting that "[Riley] be placed on the witness stand," but that he had wanted to assure that Riley's privilege had been properly invoked so that he would be unavailable

as a witness in order that appellant could testify to Riley's statements to him under the hearsay exception for statements against penal interest, discussed *infra.*

claims that the trial court should have conducted the procedure envisioned in *Carter*, so as to permit him to present Riley's testimony as part of appellant's defense. We disagree.

■ Here, any testimony given by Riley regarding his involvement in the armed robbery would have incriminated him in a retrial if his appeal were successful. Thus, as there was a possibility of future prosecution, the privilege was properly invoked. *See Daniels v. United States*, 738 A.2d 240, 244 n. 7 (D.C.1999) (noting that a co-defendant's Fifth Amendment privilege remained intact during the pendency of appeal, and thus co-defendant could be compelled to testify only if the government granted use immunity); *Ramos v. United States*, 569 A.2d 158, 162 n. 5 (D.C.1990) (remarking that a defense witness's testimony did not violate his Fifth Amendment privilege because his conviction had already been affirmed on appeal). Also, because any statement by Riley about his involvement in the armed robbery would incriminate him if it were to be helpful to appellant's defense, there was no need to call Riley to the stand to assert the privilege, question by question, particularly where appellant proffered that he would ask Riley to acknowledge that appellant was not involved while himself confessing to the crime. *See Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) ("To sustain the privilege [against self-incrimination], it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."); *Brown, supra*, 864 A.2d at 1004; *Reese v. United States*, 467 A.2d 152, 157 (D.C.1983) (stating that the trial court had not erred when it failed to re-quire defense witnesses to invoke the Fifth Amendment on a question-by-question basis because "the trial court may bar a witness from testifying in the jury's presence if it properly concludes that the witness will refuse to answer essentially all the questions which he may be asked."); *Alston v. United States*, 383 A.2d 307, 313 (D.C.1978) (holding that appellant was not prejudiced by the court excusing a witness from testifying where the witness invoked a "proper claim of privilege" from testifying and "his appearance on the stand could not have aided appellant in his defense.").

■ As Riley's Fifth Amendment privilege was properly invoked, it could have been overcome only by a grant of use immunity, the need for which it was appellant's burden to establish by showing that Riley's proposed testimony was material, clearly exculpatory, non-cumulative, and unobtainable from any other source. *See Carter*, 684 A.2d at 344. Here, if Riley were made to testify, his defense counsel proffered, he would not only deny any culpability in the robbery, but also point the finger of blame at appellant. His testimony then was surely not "clearly exculpatory" of appellant. *See id.; Brown*, 864 A.2d at 1004 (affirming the reliance on counsel's proffer of the witness's testimony); *cf. Daniels*, 738 A.2d at 244 n. 7 (use immunity granted to accomplice/co-defendant who testified about his participation in the crime). In these circumstances, the trial court did not err in upholding Riley's invocation of the privilege without further inquiry into the possibility of immunity.

**B. *Refusal to Allow Confession as a Statement Against Penal Interest***

Appellant argues that having upheld Riley's Fifth Amendment privilege, the trial court should have allowed appellant to testify regarding statements that Riley made to him regarding his responsibility for the

robbery and appellant's innocence. The trial court, relying on our decisions in *Laumer v. United States*, 409 A.2d 190 (D.C. 1979) (en banc), and *Lyons v. United States*, 514 A.2d 423 (D.C.1986), did not allow appellant to introduce this testimony under the hearsay exception for statements against penal interest. The trial court ruled that although Riley was unavailable due to his assertion of the Fifth Amendment privilege, which satisfied one condition of that hearsay exception, the veracity of appellant, as the person reporting the statement, was "highly suspect" because he had "an absolute total motive for fabrication," and there were no corroborating circumstances clearly indicating the trustworthiness of Riley's inculpatory statement.

▆▆▆▆ The trial court's conclusion that a statement is (or is not) against the declarant's penal interest is "clearly a legal question" that we review *de novo*. *Ingram v. United States*, 885 A.2d 257, 263 (D.C.2005). As the trial court recognized, whether a proffered declaration is admissible as a statement against penal interest requires a three-step inquiry: "(1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Laumer*, 409 A.2d at 199.

> In determining whether the declarant in fact made the proffered statement, the trial court's focus is not on the truth of the declaration, but on the veracity of the witness who repeats the declaration.... Where appropriate, the trial court must also assess the general credibility of the witness and probe for inter-

est, bias, and the possible motive for fabrication.

*Id.* Here, the trial court found appellant's general lack of credibility—illustrated particularly by repeated diagnoses after psychiatric evaluations that he was a "malingerer," discussed *infra*—as well as his motive for fabrication cast doubt on whether the alleged statement was, in fact, made by Riley. This finding is well-supported by the record and was not clearly in error.

The trial court's finding that the statement was not made under circumstances that corroborate its trustworthiness was also in accordance with governing law. In *Laumer*, we held that in making this determination, courts should (1) consider the timing of the declaration;[4] (2) to whom the statement was made; (3) the existence of corroborating evidence in the case; and (4) the extent to which the declaration is really against the declarant's penal interest. 409 A.2d at 200–03. The trial court conducted this analysis and found that appellant's testimony regarding Riley's purported statements—made to appellant long after the offense (whereas Riley had told the police on the day of the offense that appellant was responsible), and without any corroborating evidence—lacked trustworthiness. The hearsay statements, therefore, were properly excluded.

### C. Refusal to Instruct Jury on Intoxication

▆▆▆▆ Appellant argues that the trial court erred in refusing his request for a jury instruction on voluntary intoxication. "[F]ailure to give an instruction embodying a defense theory that negates guilt of the crime charged, when properly requested and supported by any evidence, is nec-

---

**4.** "This focus on time is based on the notion that declarations made shortly after the crime for which an accused is charged are often more reliable than those made after a lapse of time." *Laumer*, 409 A.2d at 200.

essarily reversible error." *Gray v. United States,* 549 A.2d 347, 350–51 (D.C.1988) (citations omitted). We have held that "[t]he evidence required to warrant the 'intoxication-defense' instruction must reveal such a degree of complete drunkenness that a person is incapable of forming the necessary intent essential to the commission of the crime charged." (*Charles C.) Smith, Sr. v. United States,* 309 A.2d 58, 59 (D.C.1973), *quoted in Washington v. United States,* 689 A.2d 568, 573 (D.C. 1997); *see also Powell v. United States,* 455 A.2d 405, 412 n. 10 (D.C.1982); *Nicholson v. United States,* 368 A.2d 561, 565 (D.C.1977); *Williams v. United States,* 331 A.2d 341, 343 (D.C.1975). There must be evidence that the defendant "has reached a point of incapacitating intoxication." *Smith,* 309 A.2d at 59, *quoted in Washington,* 689 A.2d at 573. "Drunkenness, while efficient to reduce or remove inhibitions, does not readily negate intent." *Washington,* 689 A.2d at 573 (quoting *Heideman v. United States,* 104 U.S.App. D.C. 128, 131, 259 F.2d 943, 946 (1958)).

■ In assessing whether an intoxication instruction is warranted, "[t]he trial court may look to the facts surrounding the offense to decide if the evidence could create a reasonable doubt in the mind of a reasonable juror as to whether a defendant possessed the requisite specific intent." *Washington,* 689 A.2d at 574. In the case of a robbery, "the defendant's careful advance preparation for the crime showed that he was working 'logically, rationally and efficiently to the execution of his criminal purpose.' " *Id.* (quoting *Heideman,* 104 U.S.App. D.C. at 131–32, 259 F.2d at 946–47).

■ Here, as the trial court found, the nature of appellant's crimes and the way in which they were executed reveal a carefully designed and implemented scheme that would be difficult to attribute to someone completely incapacitated by intoxication. Although there was evidence that appellant had spent the morning before the robbery drinking and smoking "blunts," and by his own testimony, by the time he left the house where he was "getting high," he was "falling down" from intoxication, the manner in which he committed the armed robbery of a public establishment belies the claim that he was incapacitated. According to store employees, appellant concealed his face, ordered people to the back of the store, retrieved the store's security camera, made the manager take off his clothes (presumably to keep him from following appellant out of the store), and escaped in a getaway car waiting in the alley. As the trial court noted, these were all very deliberate and rational acts. *See id.* We conclude, therefore, that the evidence did not support a defense of intoxication, and the trial court properly refused the requested jury instruction.[5]

### D. Denial of Insanity Defense

We also conclude that the trial court did not err in denying appellant's request to present an insanity defense. Prior to trial, on September 20, 2000, appellant's counsel requested that the trial court grant "leave to explore [the insanity defense] and to present it to the jury." The government argued that the motion was untimely since appellant had not given notice or satisfied other "predicate conditions" before attempting to introduce the defense. The trial court ruled that, "[f]or the reasons stated by the government, the motion is denied."

---

**5.** As noted, the defense presented evidence that appellant was intoxicated and, in closing, defense counsel argued that appellant did not have specific intent to rob the store.

The procedure for presenting an insanity defense in the District of Columbia is established by statute:

Insanity shall not be a defense in any criminal proceeding in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia, unless the accused or his attorney in such proceeding, at the time the accused enters his plea of not guilty, or within 15 days thereafter, or at such later time as the court may for good cause permit, files with the court and serves upon the prosecuting attorney written notice of his intention to rely on such defense. No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence.

D.C.Code § 24–501(j) (2001) *formerly* D.C.Code § 24–301(j) (1981).

▆▆▆▆▆ In the District of Columbia, the defendant has the burden of proving insanity by a preponderance of the evidence. *See id.; Patton v. United States,* 782 A.2d 305, 311 (D.C.2001). "To establish a *prima facie* case, the defendant must present sufficient evidence to show that 'at the time of the criminal conduct, as a result of a mental illness or defect, he lacked substantial capacity to recognize the wrongfulness of his act or to conform his conduct to the requirements of the law.'" *Patton,* 782 A.2d at 311–12 (quoting *Pegues v. United States,* 415 A.2d 1374, 1378 (D.C.1980)). If a defendant fails to establish a *prima facie* case, the trial court is justified in not presenting the issue to the jury. *See Pegues,* 415 A.2d at 1377; *Cooper v. United States,* 368 A.2d 554, 559–60 (D.C.1977). This court reviews a trial court's decision to deny presentation of testimony in support of an insanity defense for abuse of discretion. *See Pegues,* 415 A.2d at 1378.

The possibility of presenting an insanity defense was repeatedly alluded to by appellant and his counsel throughout the pretrial proceedings,[6] but formal notice of in-

**6.** In May 1999, the trial court conducted a four-day competency hearing which included testimony from two expert witnesses. The court found that appellant was competent to stand trial and accepted the opinion of the government's expert, who had treated and observed appellant over several months, that although appellant suffered from serious mental problems, he was a malingerer.

On January 16, 2000, appellant wrote a letter to the trial judge stating that he wanted to enter a plea of not guilty by reason of insanity. In the letter, appellant wrote that "you won't kill me like that yall can plott 911 want to but the truth will come out in trial on 29 Jan." (sic).

On March 6, 2000, at a status hearing, the trial court inquired of appellant's first trial counsel, Gary M. Sidell, if he had filed a notice of intent to raise the insanity defense. Counsel replied that he had not because he did not have an appropriate expert opinion to pursue such a defense. He had made arrangements with Dr. Dorothy Holmes, a psy-

chologist at St. Elizabeths Hospital who had gone to the jail to visit appellant, but appellant had refused to see her because the jail staff erroneously informed appellant that it was his attorney, rather than a doctor, who was there to see him. At the time appellant had been quarreling with his attorney and did not want to see him.

The following day, on March 7, 2000, the trial court appointed John Harvey III as new counsel for appellant. Mr. Harvey indicated to the trial court that he might be interested in filing a notice to use the insanity defense, but that he was worried that it would be time-barred. The trial court assured him, however, that "I can tell you right now, Mr. Harvey, that it's not automatically precluded by the date. You're coming into this new. We have to have some flexibility." Mr. Harvey said that he would contact Dr. Holmes as quickly as possible and then file "whatever appropriate documents."

At a brief status hearing on April 14, 2000, Mr. Harvey noted that he would like to keep

tent to introduce the insanity defense was never filed, nor was any evidence introduced to support an insanity defense.

It appears that appellant first entered his not-guilty plea on September 20, 2000,[7] the same day on which the trial court denied counsel's oral request to present an insanity defense; therefore, pursuant to the provisions of D.C.Code § 24–501(j), appellant still had fifteen days from that date to notify the court and the government

that he wished to present an insanity defense. Thus, to the extent that the trial court denied appellant's motion on the grounds that it was untimely, it was in error.

▮ We nevertheless conclude, however, that the trial court did not abuse its discretion in denying use of the insanity defense because appellant had not provided any evidence to support it. As noted,

open as an option an insanity plea, because appellant had not yet been arraigned. The court did not respond to this assertion, although the government argued that appellant had been arraigned in November 1999 and that "we're outside the time lines for that plea." As noted *infra*, see note 7, the government was mistaken.

On May 26, 2000, at another status hearing, appellant's counsel indicated that he had "some concerns" regarding appellant's competency, "notwithstanding the Court's ruling of malingering." He also had "additional concerns" about what "his mental state and condition was at the time of the offense." The trial court responded, "Well, that's productivity," to which counsel responded, "Exactly." The issue was not further discussed, however, and a trial date was set for September 19, 2000.

On September 12, 2000, appellant's counsel filed a "Motion to Continue Trial and for Forensic Examination," stating that appellant "has begun to exhibit behavior which is consistent with mental disorder; that appellant, "because of his condition, [has] been unable to assist counsel with his defense; that appellant had sent letters to counsel and a U.S. Attorney expressing a desire to die; and that appellant no longer was taking his medication." Attached to the motion were letters from appellant addressed to the judge, his attorneys (current and former), the U.S. Attorney, and the "FBI–CIA–KGB." In the letters, appellant wrote that he thought his attorney was in the CIA, stating "Get out of my head" (accompanied by drawings of frowning faces and stick figures), and referred to transmitters that had been implanted in his head.

At a hearing held on September 15, 2000, the government opposed the continuance motion, arguing that appellant was demonstrating a "pattern of malingering." Defense

counsel stated that he believed "a thorough examination of [appellant] needs to be done," and that at times appellant seemed normal, but that at others times, it was "obvious" that he was not. The rest of the hearing focused on appellant's competency, and the court finally denied the motion for a continuance for further testing, referring to previous hearings on competency.

On September 19, 2000, the trial court held a hearing on whether appellant would be able to represent himself at trial. Appellant complained about his lawyers, saying that he had told Mr. Sidell (previous counsel) that he wanted to "take the insanity plea," and that he "wanted to enter an insanity plea, and it never got around to being taken care of. And I had a talk with Mr. Harvey (then-current counsel) about the insanity plea, but the few times that he came over to the jail, I wasn't well enough to see him, so he didn't go through with [it]." The court responded by telling appellant that his options were "closing up," and that both of his attorneys had talked about his refusal to meet with them, adding, "I don't have any indication, actually, that you would be able to assert the insanity defense." The court added that "it's long past the time for you to tell the government that you are asserting the insanity defense, Mr. Bell, so I think that one is behind you."

7. Although the government (and the trial court) believed that appellant had been arraigned in November 1999, there is nothing in the record indicating he was then arraigned, as the government now concedes. The docket entry for September 20, 2000 indicates that the government's jacket showed that appellant was arraigned on November 3, 1999, but neither the docket entry for that day nor the transcript from that day's proceedings reflect the entry of a plea.

the burden is on the defendant to show that he has a substantial insanity defense, and if he cannot present at least a *prima facie* case of insanity, the trial court is justified in precluding the defense from being presented to the jury. *See Pegues*, 415 A.2d at 1377. Here, although there had been extensive psychological evaluations to determine appellant's competency to stand trial, no productivity examination was conducted to determine whether appellant's actions on the day of the robbery were the result of mental illness. When counsel requested permission to introduce the insanity defense, he did not proffer that he had an expert who would testify in support of an insanity defense-only that he had contacted the expert who had testified somewhat favorably for appellant during the competency hearings and that he needed to explore the matter further.[8] Given that appellant's psychological and mental condition had been an issue throughout pre-trial proceedings that spanned over eighteen months, and that the trial court had repeatedly inquired whether appellant was planning to pursue an insanity defense, there had been ample time to request a productivity examination or secure expert witnesses to support such a defense. On this record, where the request was made the day before jury selection began, one week before trial, and without any persuasive evidence to dissuade the judge from her previous finding that appellant was malingering, we conclude that the trial court did not abuse discretion in refusing to allow an insanity defense.

## III. Assault as a Lesser–Included Offense of Armed Robbery

■ Appellant claims that he was entitled to a jury instruction on the lesser-included offense of assault. During a discussion of jury instructions, appellant requested an instruction on simple assault, arguing that because assault is a lesser-included offense of armed robbery, "the jury could find that the defendant while assaulting [the store employees] did not commit the acts of armed robbery." The trial court refused appellant's request, finding that there was no basis in the record for the instruction.

■ Although, "any evidence, however weak, is sufficient to support a lesser-included instruction so long as a jury could rationally convict on the lesser-included offense after crediting the evidence," *Woodard v. United States*, 738 A.2d 254, 261 (D.C.1999), for the jury here to find that appellant assaulted the store employee, whom he confronted, but that he did not rob the store would require a "bizarre reconstruction of the evidence." *McClam v. United States*, 775 A.2d 1100, 1104 (D.C. 2001) ("[T]rial judges properly deny instructions which require the jury to engage in 'bizarre reconstructions of the evidence.'" (quoting *Adams v. United States*, 558 A.2d 348, 349 (D.C.1989))). "A trial judge can properly deny the requested instruction only if there is no factual dispute and a finding to the contrary on the only evidence at issue would be irrational." (*Kevin*) *Smith v. United States*, 686 A.2d

---

**8.** Dr. Dorothy Holmes, a psychologist at St. Elizabeths Hospital, had found appellant to be incompetent to stand trial, and diagnosed him as suffering from paranoid schizophrenia and poly-substance abuse psychosis. She expressed the view that appellant's paranoid schizophrenia had begun in his pre-teen years, and had been aggravated by his abuse of PCP. As noted, the trial judge instead credited the opinion of Dr. Hugonet who, while acknowledging that appellant may have suffered from psychosis (auditory hallucinations) throughout his life—including after the robbery—due to twenty-seven years of heavy PCP use, appellant was malingering and accentuating his symptoms in order to avoid prosecution.

537, 545 (D.C.1996) (quoting *Rease v. United States,* 403 A.2d 322, 329 (D.C. 1979)). An instruction on simple assault would have been irrational on the evidence presented. That the store was robbed was not in dispute. The critical issue was the identity of the robber: either the jurors credited the testimony of the store employees and the physical evidence indicating that appellant committed the crime, or they believed appellant's version that he was never in the store at all.

Appellant also argues that if the jury found he lacked the requisite specific intent to commit armed robbery, *see* D.C.Code § 22–2801 (2001) (armed robbery); *United States v. Owens,* 332 A.2d 752, 753 (D.C.1975) (noting that although robbery statute does not mention specific intent, it must be read in light of common law requiring specific intent to take property of another as element of robbery), then it could have found him guilty of the lesser-included offense of assault, a general intent crime. But without an intoxication defense—which we have determined was properly rejected—there was no rational construction of the facts that would have allowed the jury to find that appellant pointed a gun at the store employees and customers and demanded money, but did not have the specific intent to rob them. The assault instruction, therefore, was properly refused.

## IV. Waiver of the Right to Counsel

▇▇▇ Appellant claims that his Sixth Amendment right to counsel was violated when the trial court allowed him to represent himself at sentencing without first conducting a "penetrating and comprehensive examination of all the circumstances." "A defendant has the right to effective assistance at all critical stages of a criminal proceeding, and sentencing is a critical stage." *Johnson v. United States,* 585 A.2d 766, 770 (D.C.1991) (citations omit-

ted). The trial court is encouraged to follow the "script" fashioned by Justice Black in *Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948), when undertaking the examination to ensure that a defendant's waiver of the Sixth Amendment right to counsel is knowing and intelligent. *Ali v. United States,* 581 A.2d 368, 372 (D.C.1990) (quoting *Hsu v. United States,* 392 A.2d 972, 983 (D.C. 1978)). Otherwise, "the appellate courts cannot uphold the finding of a valid waiver unless the inquiry of record is buttressed by a compelling case of circumstantial evidence that the *pro se* defendant knew what he or she was doing." *Id.* This process, known in this jurisdiction as the "*Hsu* inquiry*,*" requires the trial court to perform a searching probe into whether a defendant's decision to waive the assistance of counsel is valid.

> To be valid such waiver [of counsel] must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances....

*Hsu,* 392 A.2d at 983 (quoting *Von Moltke,* 332 U.S. at 724, 68 S.Ct. 316).

▇▇▇ As we have stated, "in order to represent himself, the accused must 'knowingly and intelligently' forgo [the] relinquished benefits [attributed to representation by an attorney]." *McClinton v. United States,* 817 A.2d 844, 849 (D.C. 2003) (quoting *Ali, supra,* 581 A.2d at 371). "Although a defendant need not himself have the skill and experience of a lawyer

in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

■■■ Our review of the record confirms that the trial court fulfilled its duty under *Hsu* and satisfactorily ascertained that appellant was waiving the assistance of counsel at sentencing with open eyes. During the course of trial, appellant often expressed dissatisfaction with his attorneys and said that he wished to represent himself. On the occasions when appellant insisted that he wished to represent himself, the trial court either allowed him time to discuss the matter with his attorney or attempted to dissuade him from doing so, and on each of these occasions appellant decided to continue to be represented by counsel.

In particular, on September 19, 2000, just before trial began, appellant informed the court that he wished to represent himself. The trial court conducted a thorough *Hsu* inquiry, covering over fifty-two pages of transcript. The inquiry covered all of the necessary *Hsu* bases.[9] This included, in particular, a discussion regarding whether appellant understood the penalties possible for a conviction of each of the crimes with which he was charged, which the trial court outlined in detail, followed by an explanation that the government was requesting a sentence enhancement based on his four prior felony convictions, records of which were filed with the trial court and copies given to appellant. The following day, when the trial court attempted to resume the *Hsu* inquiry, appellant stated that he was not interested in answering any more questions, and his counsel continued to represent him. The trial court noted that appellant seemed to be withdrawing his request to represent himself because his answers to the court's inquiry the previous day showed that appellant was "reasonably knowledgeable and capable," which, the court also noted, undermined appellant's assertions that he was incompetent to stand trial. The trial court opined that appellant's change of heart was evidence that appellant "makes very tactical decisions and is actually quite a good tactician."

9. The trial court asked appellant why he wanted to represent himself (because he thought he could do a better job than his two court-appointed attorneys); whether he understood each of the charges against him (yes); whether he wished to be found not guilty of all of them (yes); whether he understood the penalties possible for a conviction of each charge, explained to him by the trial court (yes); whether he understood that the government was requesting a sentence enhancement based on his four prior felony convictions, records of which were filed with the trial court and copied to appellant (yes); whether he understood that he had an absolute right to an attorney (yes); whether he had discussed with anyone his decision to represent himself (yes, the jailhouse lawyer/librarian); whether he understood the elements of the four charges with which he was charged (yes); whether he wanted to represent himself despite having denied receiving any documents or files from his former attorneys regarding the case (yes, although he noted he would like to receive all of the necessary court documents before proceeding with his self-representation); whether he had previous experiences with jury trials (no); whether he had previously represented himself (no); whether he had experience picking a jury (no); whether he understood that he had a right to select a jury (yes, it had been explained to him, but he did not think it was important); whether he understood that he had a right to make an opening statement, and would he be prepared to do that (depending on what the prosecutor said, he may "waive that right"); and whether he understood the process and technique of examining witnesses (yes).

After trial, on May 18, 2001, appellant again expressed to the court dissatisfaction with his attorney (Mr. Harvey at the time) for filing a motion for a new trial without first consulting him, and said that he had not talked to his lawyer in seven months. After appellant filed a complaint with Bar Counsel, Mr. Harvey moved to withdraw. Appellant requested that the trial court appoint a new attorney for him, but refused the court's appointment of Stuart Johnson, because appellant did not "feel comfortable with him," and he "knows nothing about the case." The trial court noted that appellant had complained about his two previous attorneys as well, and assured appellant that Mr. Johnson was "clearly capable" of assisting him and was "extremely experienced counsel." When the trial judge asked whether appellant wished to withdraw the motion for new trial that had been filed on his behalf by Mr. Harvey, appellant said "no." He added that what he wanted was a lawyer who would consult with him about the grounds for the motion before filing it. The court explained that appellant could either accept Mr. Johnson's appointment or represent himself; appellant chose the latter. The trial court accepted his decision.

On June 8, 2001, during a hearing on appellant's motion for a new trial, the following exchange took place:

THE COURT: Before we conclude this hearing today, Mr. Bell, I want to say that I think you are ill-advised to represent yourself. You have a right to counsel. I selected Mr. Johnson because he is extremely experienced counsel, very competent counsel and it was my intention to select someone for you that I thought could address the multiple issues. I don't know whether Mr. Johnson is still available or not, but I would like to ask you again if you would like me to ask Mr. Johnson to represent you, completely apart, Mr. Bell, from these new trial motions, your sentencing is coming up and I just wonder that you don't want at least an attorney to consult with in that regard. Do you truly want to continue to represent yourself?

APPELLANT: I don't have a choice. Because you keep sending me these bogus attorneys and you keep saying that they are good, but attorneys don't talk to me for seven months and then he filed a motion, you know, without my consent I don't see that as being good. I think that's, I'll be honest.

THE COURT: I know you understand you have the right to an attorney, right?

APPELLANT: Yes.

THE COURT: I'll, let's see, at one point did we talk about the possibility that you could have an attorney advise you? He wouldn't actually represent you, but he would advise you? I think we did around the time of your trial. Do you wish me to appoint an attorney to advise you?

APPELLANT: (indiscernible) file the motions.

THE COURT: I will say that I think we went through the question of you representing yourself at some length at the time of the trial, so I hesitate to, you know, cause you aggravation by going through this all again. But, I surely want you to know that I stand prepared to appoint Mr. Johnson for you.

Quite honestly, I'm at a loss with respect to what attorney to appoint. You seem to have had very bad luck with attorneys, Mr. Bell, and you've had Mr. Sidell, you've had Mr. Harvey. You didn't want Mr. Johnson for whatever reason. I guess you don't trust my judgment. Are you sure you don't want me to appoint counsel for you?

APPELLANT: (No audible response.).

THE COURT: You know, in terms of a note that I've waited a couple of minutes and I haven't heard a response from you, Mr. Bell, I have been sitting here trying to think of what advantages there might be for you in terms of sentencing. The new trial motion, I know what advantages there are and that is because it's a very technical legal area of the law and I know you don't understand it. . . . So in terms of a new trial motion, that, I know you would benefit from counsel on. With respect to sentencing, I'd like to go on to the issue of sentencing. When you stand before me for sentencing, Mr. Bell, you won't have anybody next to you to make arguments on your behalf that might conceivably be more persuasive than arguments that you would have about how I should sentence you. Or the conditions of your incarceration. I think you might want someone to stand next to you and argue on your behalf at that time.

APPELLANT: No.

THE COURT: Are you certain that you do not?

APPELLANT: I think that you have done a pretty good job so far so I'll let you deal with what you have to deal with (indiscernible).

THE COURT: Well, I can only say, Mr. Bell, that Mr. Sweeney will be arguing the Government's point of view and I would think that you would want someone to argue your point of view.

APPELLANT: (indiscernible) I am already (indiscernible) so I'm basically (indiscernible) so I'll just deal with it.

 The trial judge's discussion with appellant concerning the sentencing process, combined with the extensive *Hsu* inquiry conducted just before trial, see note 9, *supra*, apprised appellant of the benefits and availability of counsel, and of the risks of proceeding without a lawyer, so that we can conclude that appellant's decision to proceed without an attorney was voluntarily and knowingly made. No further inquiry was necessary, particularly where the trial court repeatedly offered to appoint an experienced lawyer to represent appellant, an appointment appellant refused only because he did not "feel comfortable" with the proffered lawyer. A defendant's right to counsel does not include a right to appointed counsel of his choice, and here, appellant offered no good cause for refusing the lawyer the court intended to appoint. *See Johnson*, 585 A.2d at 770–71 (holding that "a trial judge is obliged to appoint new counsel if a defendant can establish 'good cause, such as conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which [could] lead ... to an apparently unjust verdict' " (quoting *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir.1981))); *see* W. LA-FAVE & J. ISRAEL, CRIMINAL PROCEDURE § 11.4 at 36–37 (1984)); *cf. United States v. Gonzalez–Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (trial court's erroneous disqualification of the defendant's chosen counsel violated his Sixth Amendment right because "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."). Appellant argues on appeal that the trial judge should have persisted, and not accepted his refusal of counsel, given appellant's limited education (10th grade), long-term emotional problems and difficult reactions to medication. But to persist more than the trial judge did could have been perceived as coercion, particularly where appellant had previously complained that he had been "forced to take [counsel] because I have no right to represent myself." In light of appellant's refusal to accept the trial court's appointment of a third attorney to represent him, and considering that the

trial court had already conducted a *Hsu* inquiry pre-trial, informed him of the benefits of having legal representation during sentencing, and repeatedly discouraged him from proceeding *pro se*, the trial court was justified in accepting appellant's waiver of his right to counsel.

## V. Merger

■ Lastly, appellant argues that his conviction for possession of a prohibited weapon with the intent to use it unlawfully (PPW) [10] merges with his conviction for possession of a firearm during the commission of a crime of violence (PFCV). [11]

■ "The [Double Jeopardy Clause of the] Fifth Amendment does not prohibit separate and cumulative punishment for separate criminal acts." *Owens v. United States*, 497 A.2d 1086, 1094–95 (D.C.1985). "When a defendant is convicted of violating more than one statutory provision on the basis of the same act or course of conduct," the question is whether both constitute the "same offense." *Hanna v. United States*, 666 A.2d 845, 853 (D.C. 1995). In the absence of clear legislative intent, the Supreme Court's *Blockburger* test applies: "[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)); *see also* D.C.Code § 23–112 (1989).

Applying *Blockburger*, we conclude that PPW and PFCV require proof of different elements. PPW requires proof that the accused (1) possessed (2) one of the proscribed weapons [12] (3) with the intent to use it unlawfully. PFCV, on the other hand, requires that the firearm merely be possessed while the accused is "committing a crime of violence or dangerous crime." *Matthews v. United States*, 892 A.2d 1100 (D.C.2006). The elements of the two crimes are clearly distinct, as PFCV requires only possession during actual commission of a crime of violence—an element absent from PPW—whereas PPW requires proof of the accused's intent to use a BB gun unlawfully—which is not required to prove PFCV. Since each crime requires proof of an element that the other does

---

**10.** D.C.Code § 22–4514 (2001) *formerly* D.C.Code § 22–3214(b) (1981). Possession of certain dangerous weapons prohibited:

> (b) No person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or other dangerous weapon.

**11.** D.C.Code § 22–4504 (2001) *formerly* D.C.Code § 22–3204(b) (1981). Carrying concealed weapons; possession of weapons during commission of crime of violence; penalty:

> (b) No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imi-

tation firearm while committing a crime of violence or dangerous crime as defined in § 22–4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

D.C.Code § 22–4501(f) (2001) defines a crime of violence to include "robbery."

**12.** The PPW statute forbids "the possession of . . . an imitation pistol [BB gun] with intent to use it in an assaultive or otherwise unlawful manner." *Reid v. United States*, 581 A.2d 359, 362 (D.C.1990).

not, the dual convictions survive the *Block-burger* test and do not merge. *See Hanna,* 666 A.2d at 857 (PFCV requires possession of a firearm during a crime of violence while PPW requires possession of a "specifically prohibited weapon . . . .")

For all the foregoing reasons, appellant's convictions are hereby

*Affirmed.*