*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 10-CF-181

JERMYL MOODY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-393-08)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued June 18, 2013                    Decided December 13, 2013)

*Thomas D. Engle*, with whom *Sharon L. Burka* was on the brief, for appellant.

*Kristina L. Ament*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Heather Carlton*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and OBERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Associate Judge* FISHER.

Dissenting opinion by *Senior Judge* RUIZ at page 23.

FISHER, *Associate Judge*: Appellant Jermyl Moody was convicted by a jury of two counts of possession of a controlled substance (ecstasy and marijuana),[1] unlawful possession of a firearm by a convicted felon,[2] carrying a pistol without a license (CPWL),[3] unlawful possession of ammunition,[4] and possession of an unregistered firearm.[5] Two months later, appellant filed a motion for a new trial based on newly discovered evidence. Appellant had located a potentially exculpatory witness who claimed a Fifth Amendment privilege, and he requested that the trial court apply the procedure endorsed by this court in *Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc), in considering his motion for a new trial. The court held evidentiary hearings on October 23 and December 11, 2009, but the witness proffered by the defense did not testify. After the trial judge denied the new trial motion, this appeal followed. Appellant's counsel confirmed at oral argument that his client is not seeking a new trial on the drug charges.

---

[1] D.C. Code § 48-904.01 (d) (2001 & 2007 Supp.).

[2] D.C. Code § 22-4503 (a)(2) (2001 & 2007 Supp.).

[3] D.C. Code § 22-4504 (a) (2001).

[4] D.C. Code § 7-2506.01 (2001).

[5] D.C. Code § 7-2502.01 (a) (2001).

We conclude that the trial court did not abuse its discretion in denying the motion for a new trial. The court carefully applied *Carter*, declining to override the government's decision that it would not grant the witness testimonial immunity. This was not an abuse of discretion. We further conclude that the trial court properly denied the motion on the ground that the proffered testimony would not likely produce an acquittal at a new trial.

## I. Facts

On January 5, 2008, Metropolitan Police Department (MPD) Officers Amy Oliva and Mark Nassar conducted a traffic stop of a black Cadillac CTS with heavily tinted windows. Upon request, appellant, the driver, lowered all four windows. The officers saw a female passenger in the front passenger seat and noticed "a strong odor . . . of an alcoholic beverage." Officer Oliva found an opened bottle of vodka and two plastic cups, and appellant and the female passenger were placed under arrest. During a search of the car incident to arrest, the officers found several items that were later introduced at trial, including a black briefcase on the rear floorboard. Appellant admitted that the briefcase was his, but

he declined to open it, asserting that it contained nude photographs of his wife. (No such photographs were found.)[6]

The briefcase contained a loaded Sig Sauer semiautomatic handgun, approximately fourteen-hundred pills, marijuana, some loose powder, and a pipe used to smoke marijuana. Police also found a bullet on the driver's side floorboard between the seat and the transmission hump, a single bag of marijuana in the trunk of the car, and a red Ziploc bag in appellant's left front pants pocket containing twelve pills. A government expert testified that the bullet found on the driver's side floorboard was not "any different" in appearance than the bullets recovered from inside the magazine and chamber of the handgun found in the briefcase. The government's chemist testified that although a few of the pills in the red Ziploc bag in appellant's pants pocket and in the briefcase contained ecstasy, most were "fake" ecstasy.

---

[6] There is no support for the dissent's suggestion that Judge Leibovitz did not give much weight to police testimony that appellant admitted, both directly and inferentially, that the briefcase was his. One officer testified that appellant stated the briefcase was his. Two officers testified that he declined to open the briefcase, claiming it contained nude photographs of his wife. Neither officer had memorialized these statements, but such shortcomings in documentation are far from uncommon and would not likely be thought to undermine the credibility of the officers.

Thus, in brief summary, appellant admitted the briefcase was his. A bullet found on the driver's side floorboard was not "any different" than the bullets found in the handgun inside the briefcase. The Ziploc bag in appellant's pocket contained green and yellow ecstasy pills and some fake ecstasy pills, and the briefcase contained some green and yellow ecstasy pills and hundreds of fake ecstasy pills. There was marijuana in the briefcase and in the trunk of appellant's car.

At trial, the defense called the passenger, Nicole Smith. Smith testified that she did not see the briefcase when she entered the car, and that another passenger, who entered the car at approximately the same time as Smith, had sat in the back seat of the car and exited the vehicle at the Metro station off of 5th and K Streets just before they were pulled over by the officers. The defense also played portions of recorded phone calls made while appellant was in jail in which he stated that he dropped "Leroy" off at the Metro, and "that Leroy left his stuff in the car." The defense did not call Leroy as a witness or seek a continuance to locate him. At the conclusion of the trial, appellant was found guilty of all charges.

## II.  The Rule 33 Motion

In his motion for a new trial, appellant announced that he had located the backseat passenger and wanted to present him at a new trial as an exculpating witness. Appellant attached a handwritten statement signed by Leroy Odom in which Odom admits to leaving in appellant's car a briefcase that contained a handgun and over 1500 pills. The statement was not notarized, but it was signed by Odom "under the penalty of perjury" and witnessed by James Glenn, Odom's brother. At a hearing on the new trial motion, appellant, his friend Gregory Daniels, and Odom's brother, James Glenn, each testified that they had spent a significant amount of time searching for Odom before appellant's trial, but that they had been unable to find him. Odom's counsel informed the court that Odom would not testify at a new trial (or at the motion hearing) unless the government granted him immunity, and both Odom's counsel and appellant's counsel asked the court to follow the procedure this court set out in *Carter*.

At the trial court's request, the government debriefed Odom. Odom's counsel was present at the debriefing, which lasted more than two hours. The prosecutor announced at a subsequent hearing that the government would not provide immunity to Odom to facilitate his testimony at a Rule 33 hearing because she believed "that by putting this witness on the stand [the government] would be sponsoring perjury." The prosecutor and Odom's counsel provided oral

descriptions of Odom's statements at the debriefing, and the trial court gave defense counsel an opportunity to address the issue of immunity. Counsel argued that without the testimony of Odom, he would not be able to "put on the evidence that [would] allow [appellant] to get a new trial."

The prosecutor gave an extensive proffer of the debriefing with Mr. Odom, only part of which we will summarize here. For long periods of time, Odom was in a "crack haze" and lived on the streets. Although he claimed to have lived with his wife for a couple of months in 2008, "[h]e couldn't remember what the time period was." Odom said he sometimes lived with family, but he couldn't provide details. Suspiciously, however, he claimed, in the words of the prosecutor, to remember the night of appellant's arrest "in startling detail." On the other hand, "[h]e forgot his Burberry coat in the trunk [of Mr. Moody's car] because he was so drunk he couldn't remember." Moreover, Odom couldn't remember anything else being in the briefcase apart from fake ecstasy pills and the pistol. He claimed to have been dropped off at the Union Station Metro stop, but the testimony at trial indicated he was dropped at the New York Avenue Metro Station. He could not recall the brand of pistol in the briefcase, and he could not (or would not) give details about where he purchased the weapon. He seemed to be claiming that he

had been in a drug treatment facility at the time of trial, but records subpoenaed by the government showed that he entered after the trial had ended.

The trial court ruled that the Sixth Amendment right to compel the attendance of witnesses and present a defense at trial is inapplicable at a motion hearing, and thus *Carter* did not apply in the context of a new trial motion. Nonetheless, assuming that *Carter* did apply, the trial court found that it was reasonable for the government to decline to grant immunity to Odom.

The court determined that there was so much "internal incredibility and inconsistency" in Odom's statements at the debriefing, that the government could "reasonably decline to immunize in these circumstances." The court pointed to "all of the contradictions internally" of Odom's testimony; indicated that Odom "would be impeached with seven impeachable convictions"; and noted "the timing of his having come forward, many months after a trial that he knew was taking place when it was taking place, and as to charges that he knew the defendant was facing but didn't come forward . . . ."

The court particularly disbelieved Odom's claim that the gun was his. Judge Leibovitz referred to the testimony of Gregory Daniels, who encountered Odom

shortly after Moody's arrest and told him "if the briefcase [is] yours, you need to take your charge. And that's when [Odom] told me that, well, tell [Moody] that he shouldn't be worried because . . . the drugs weren't real." As the court explained, "Odom said don't worry about it because what's in there wasn't real. He said absolutely nothing about the weapon." "[T]here was no mention of a gun until [the court] received . . . the affidavit written by [Moody's counsel] and signed by the witness, in which he says [that] in the briefcase were a gun and over 1500 pills. The gun did not belong to Mr. Moody." The court concluded that Mr. Odom "would not be credible in any respect on an admission that he put that gun in that bag."

The court also noted that "there were many other facts that [Odom] just wasn't remembering [at the proffer] because he claimed he was in [a] crack haze." "And so by his own proffer, he would be testifying at trial that he was in such a crack haze, generally speaking in the weeks prior to the incident at issue here." "And on the night of the incident [he] was so drunk on top of that that by definition his credibility as to anything he would testify about that night would be hugely impaired." According to the court, "there's more than a good chance here that Mr. Odom is lying about having put the gun in the bag, and that that's why his recollection of the details of the gun . . . are very imprecise." Thus, the court

concluded that no sanction against the government for refusing to immunize Odom was warranted.

Having determined that it would not force the government to grant use immunity to Odom, the court then considered appellant's motion for a new trial. First, the court determined "that the evidence isn't properly newly discovered evidence" as "it was certainly known to the defendant at trial." "The entire trial was about Leroy Odom and this was his briefcase . . . . And so the fact is that the evidence is not newly discovered, the body is newly discovered." The court also found that "there was no failure of diligence on the part of counsel in attempting to procure and subpoena [Odom]"; in fact, the defense had "shown extraordinary diligence in the attempt to procure . . . the witness' presence . . . ."

Noting that appellant never requested a continuance to locate a witness he knew to exist, the court commented that it was either "a very wise strategic decision that Mr. Odom's testimony wouldn't add that much to the trial and it was better not to have him here," or a "determination that all the possible efforts to find [Odom] had been made and he wasn't gonna be found." The court added, however, that even if it had been presented before trial with "everything that is

currently in the record," it would not have granted a continuance because "further efforts to find [Odom] would have been futile."

With respect to the substance of the proposed testimony, the court found that the evidence was not cumulative or merely impeaching and that, if believed, Odom's testimony would be material and exculpatory, and "would result in an acquittal." However, "[t]he question is, is it credible?" The court determined that appellant "utterly fail[ed]" to prove "that the testimony as proffered would have been of such a nature that in a trial it would probably produce an acquittal." The court recognized that it lacked "an opportunity to assess the witness' demeanor," but stated that the government and Odom's counsel had proffered "what the witness' demeanor, [and] recollections would be like . . . ." "[A]ct[ing] as a 13th juror," the court found "that the proffered testimony would be highly incredible," and denied appellant's motion for a new trial on that basis.

## III. *Carter* Applied

In *Carter*, this court addressed the tension that sometimes arises between two fundamental rights – "the accused's Sixth Amendment right of compulsory process to obtain witnesses in aid of a defense, and a witness' Fifth Amendment

right against self-incrimination." 684 A.2d at 334-35. We recognized that, when there is a direct clash between these rights, the Fifth Amendment privilege prevails. *Id*. at 336, 338. We also agreed "with the overwhelming number of courts . . . that have rejected the concept of *judicially imposed* immunity." *Id*. at 338. That means of resolving a conflict would violate the separation of powers doctrine. *Id*. at 339.

We ultimately favored a "carrot-and-stick approach" which, in "an appropriate factual situation . . . leaves the defense witness immunity decision to the executive branch but reserves power in the judiciary to subject the government to certain choices of action." *Id*. at 341 (internal quotation marks omitted). One example of when corrective action by the judiciary would be required is "when the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment." *Id*. at 341 (internal quotation marks omitted). There was no such prosecutorial misconduct in *Carter*, and there is none here.

"With this background," *Carter* turned "to the more difficult issue presented . . . where there is no prosecutorial misconduct but where the same Fifth Amendment due process and Sixth Amendment fair trial issues are presented." *Id*.

at 341-42. We outlined a process trial courts should follow in evaluating and

weighing the competing claims:

> If immunity of the crucial defense witness is . . . sought, the defendant must first establish to the trial court's satisfaction that the proposed testimony is (a) material, (b) clearly exculpatory, (c) non-cumulative, and (d) unobtainable from any other source.[7] . . . If, on the initial showing, the trial judge concludes preliminarily that the process should continue, the next step might be to institute a debriefing process of the proposed defense witness by the prosecution in order to determine whether the government will accede to a grant of use immunity to the witness . . . . If after a debriefing procedure and investigation the government were to decline to grant "use" immunity to the proposed defense witness, . . . it would be for the trial court to explore the basis of the government's refusal and decide whether there will be a distortion of the fact-finding process and the indictment should therefore be dismissed for a denial of due process and Sixth Amendment rights to the defendant . . . .

*Id.* at 344-45. Typically, the defendant is "required to raise this issue pre-trial, else

it might seriously derail the trial if raised after it commences," *id.* at 345; the

pretrial procedural requirement may, however, be altered "for good cause." *Id.*

---

[7] We noted in *Carter* that "[t]hese are stringent standards and deliberately so because of the intrusion into what would otherwise be the sole prerogative of the executive branch." 684 A.2d at 341.

If, after a sufficient debriefing, the government can provide "no justifiable reason (a tactical advantage would not be sufficient) for not granting 'use' immunity," further evaluation is required. *Id.* at 342; *see also id*. at 343 (court may consider imposing sanction if "the government does not submit to the court a reasonable basis for not affording use immunity"). The imposition of a sanction may be appropriate if the government's decision "would, unless altered, result in a distortion of the fact-finding process." *Id*. at 342. However, the trial court should defer to "sound" reasons, such as "considerations of potential future prosecution, an ongoing investigation, clear indications of potential perjury, or the excusable lack of information during the debriefing to make an informed immunity decision . . . ." *Id*. "[T]here may be a number of sound reasons for declining to cloak the proffered defense witness with governmental immunity." *Id*. at 342 n.10.

The first issue presented by appellant concerns whether *Carter* applies to a Rule 33 hearing. Appellant argues that the trial court erred as a matter of law in its determination that *Carter*'s holding is limited to trial proceedings because it is based on the Sixth Amendment. This is not a simple question, but we need not reach it because the trial court made an alternative ruling applying *Carter* to these circumstances.

Appellant does not dispute that Odom validly asserted a Fifth Amendment privilege, and the government does not question that the proposed testimony, if believed, would be material, exculpatory, non-cumulative, and unavailable from any other source. *See Carter*, 684 A.2d at 344. The government debriefed Odom at the trial court's request and decided not to provide immunity because it believed that putting him on the witness stand "would be sponsoring perjury." As *Carter* required,[8] the trial court did not accept that decision uncritically. Indeed, the court commented that the government's subjective disbelief of Odom was not enough. "I don't think that that alone would be enough to sustain decision-making under *Carter*." The court therefore listened to a lengthy summary of the debriefing from the prosecutor and Odom's counsel and to a lengthy statement of the prosecutor's reasons for declining to grant immunity. It then found, and reiterated, that the government's decision was "highly reasonable," not "unreasonable in any respect," and "entirely reasonable." After giving a lengthy summary of its rationale, the court concluded "that the government is entirely reasonable in its decision not to immunize Mr. Odom and that no sanctions should be imposed under *Carter*."

---

[8] We said in *Carter* that if, after a debriefing, the government declines to grant immunity to a witness who possesses material, exculpatory, non-cumulative evidence, unobtainable from any other source, "it would be for the trial court to explore the basis of the government's refusal and decide whether there will be a distortion of the fact-finding process" and a sanction should be imposed. 684 A.2d at 345.

We see no basis for overturning this aspect of the trial court's decision. Reiterating that "[t]he grant of immunity . . . is an executive not a judicial function[,]" *Carter* itself emphasizes the importance of respect for the separation of powers. 684 A.2d at 345 ("It should be apparent from this opinion that due to the separation of powers, this process has strict confines, and deliberately so."). "On this particular issue of defense witness immunity, the trial court should consider *only* whether, after the issue has been explored, the government is abusing its discretion and distorting the judicial fact-finding process in refusing to immunize a proffered *crucial* defense witness, thereby preventing a fair trial for the defendant." *Id*. at 343. *See also id*. at 344-45.[9] Here, after careful inquiry, the trial judge concluded that the government was acting reasonably – in other words, that it was not abusing its authority to confer use immunity.

Our review is similarly limited. We review the trial court's application of *Carter* for abuse of discretion. *See Butler v. United States*, 890 A.2d 181, 189-90 (D.C. 2006) (decision not to sanction government under *Carter*). Based on the record summarized above, there was no abuse of discretion here.

---

[9] It is worth noting that appellant makes no complaint about the way his trial was conducted. As we mentioned above, he did not seek a continuance for the purpose of locating Mr. Odom.

## IV.  The New Trial Motion

It is well settled that to obtain a new trial based on newly discovered evidence,

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*Prophet v. United States*, 707 A.2d 775, 778 (D.C. 1998).  The defendant must satisfy each of these requirements.  *United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993).  "We review a decision to deny a new trial only for abuse of discretion."  *Herbin v. United States*, 683 A.2d 437, 442 (D.C. 1996).  "Thus, where the denial is reasonable and supported by the record, we will not reverse." *Id*.

In this case the government does not challenge the trial court's findings that appellant satisfied prongs (2), (3), and (4).  The government contends — and the

trial court concurred — that "[w]here the substance of a non-testifying trial witness's testimony was known to the defense at trial, that witness's offer to testify does not qualify as newly discovered evidence." We do not decide this question because there is an independent basis for affirming — the trial court properly decided that the proffered evidence was not of such a nature that in a new trial it would probably produce an acquittal.

Having determined that Odom would not be testifying at the hearing, the trial court turned to analyzing the motion appellant had filed. "Obviously I can't determine credibility based on his testimony but I can determine credibility based on the proffer." As Judge Leibovitz, who had presided over the trial, recognized, she was now, in effect, sitting as a thirteenth juror. *See Lyons v. United States*, 833 A.2d 481, 487 (D.C. 2003) (In ruling on a motion for a new trial, "the trial judge who heard the trial evidence, sits as the 'thirteenth juror' to determine whether a fair trial requires that the [additional evidence] be made available to the jury." (some quotation marks omitted)).

It is not always necessary to hear from the witness in order to fulfill this role. Indeed, we have recognized as a general rule "that a trial court is not required to hold a hearing before ruling on such a motion." *Prophet*, 707 A.2d at 779. And

here, the trial court had determined after careful inquiry that Odom would not testify voluntarily and that the government had reasonably declined to confer use immunity upon him. It therefore focused on the written statement signed by Odom and upon the substance of the debriefing as proffered by the prosecutor and Odom's counsel.

In *Prophet*, the defendant filed a motion for a new trial based on newly discovered evidence, proffering an affidavit from his former co-defendant. The trial court denied the motion without a hearing, concluding, among other things, that the witness's testimony would probably not produce an acquittal. We rejected Prophet's argument that the trial court should have held a hearing. Contrasting prior cases where the trial court had summarily denied such motions without explaining its reasons, we noted that in *Prophet* "the trial court not only gave careful consideration to the motion but explained in detail the reasons for its ruling." 707 A.2d at 779. Accordingly, we found "no abuse of discretion in the court's failure to hold a hearing." *Id.*

Here the trial court similarly gave careful consideration to the motion, first hearing testimony from three witnesses, including appellant, who testified primarily about their efforts to locate Odom prior to the trial. It then urged the

government to debrief Odom, heard a detailed proffer of that interview, and considered appellant's explanations for many of the inconsistencies pointed out by the trial court. As summarized above, the court then gave detailed reasons for concluding that appellant "utterly fail[ed]" to show that the proffered testimony of Odom would probably produce an acquittal at a new trial. We find no abuse of discretion here. *See Johnson v. United States*, 398 A.2d 354, 362 (D.C. 1979) ("The concept of 'exercise of discretion' is a review-restraining one.").[10]

## V. The Dissent

Using phrases such as "relatively minor inconsistencies and weaknesses," "everyday weaknesses," "minor inconsistencies and ambiguities," "incidental inconsistencies," and "weaknesses . . . of [a] garden variety," our dissenting

---

[10] Appellant also argues, as he did before the trial court, that his motion for a new trial should have been granted because the written statement Odom signed and Odom's statements during the debriefing could be admitted at a new trial as statements against penal interest, even if Odom did not testify. Referring to the statements at the debriefing, the trial judge asked "how could that be a statement against penal interest if he's got letter immunity at the time that he's making that statement?" This statement was based on long experience and appellant's counsel offered no meaningful response. However, as appellant points out, the record does not contain an agreement or letter granting Odom any type of immunity in connection with the debriefing. We therefore do not rely on this ground, but these statements still fail to satisfy the five-part test quoted in *Prophet*. For all the reasons summarized above, the so-called statements against penal interest would not probably have produced an acquittal at a new trial.

colleague finds the credibility assessments of the prosecutor and the trial judge insufficient to support the rulings under review. But the trial judge was not conducting *de novo* review and neither are we. We review the trial court's decision for abuse of discretion, which is a "review-restraining" standard. *Johnson*, 398 A.2d at 362.

Judge Ruiz asserts that the denial of the new trial motion cannot be upheld because the trial judge never "heard from the witness directly" and her decision therefore "was not based on a firm factual foundation." But that puts the cart before the horse. *Carter* makes clear that the judge could not override Mr. Odom's assertion of his Fifth Amendment privilege and that the government is not required to confer immunity simply because it would be helpful to hear from a witness.[11] Tackling the issues in their logical sequence, the trial judge exercised her discretion carefully, faithfully applying the necessarily imprecise standards we articulated in *Carter*. There is ample support for the trial court's judgment that the government acted reasonably in declining to confer immunity upon Mr. Odom.

---

[11] Judge Ruiz suggests hearing from Odom *in camera* as "an option that would have allowed the judge to hear from the witness directly with a minimal extension of the letter immunity that had already been provided for the debriefing." It appears that this option was not suggested in the trial court or in the briefs on appeal. It is not at all clear that the government would be any more willing to "sponsor perjury" if the public were excluded from the courtroom.

Once she had decided the issue of immunity, Judge Leibovitz was faced with the task of deciding the new trial motion without being able to hear the testimony of Mr. Odom. In doing so, she properly assessed his credibility with the tools available to her. *See Prophet*, 707 A.2d at 779. She was in no sense usurping the function of a jury; no jury would hear Mr. Odom's testimony unless a new trial were granted, and only then if the government were persuaded to grant immunity.

We do not dilute the importance of *Carter*, and its concern for fairness, by affirming on this record. The trial court clearly has an obligation to explore the basis for the prosecutor's decision not to grant immunity to the defense witness, and we have a duty to intervene when the trial court abuses its discretion. In conducting our review, however, we must respect the differing roles of the government, the trial judge, and the appellate court. Otherwise, we may forget the lessons of *Carter*, particularly the principle that granting immunity is not a judicial function.

## VI. Conclusion

The trial court's judgment denying appellant's motion for a new trial is hereby

*Affirmed.*

RUIZ, *Senior Judge*, dissenting: For the first time since the court established a procedure for judicial review of defense requests for immunity in *Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc), we are presented with a case where the trial judge has determined that the proffered testimony of a defense witness is exculpatory, material, non-cumulative and not available from another source; if believed, according to the trial judge, the witness's testimony would result in an acquittal. Also for the first time, the issue arises in the context of a motion for new trial. Thus, the appeal presents sharply defined questions: (1) whether the prosecutor acted unreasonably in refusing to grant limited immunity so that the trial judge could assess the credibility of the witness first-hand, as a "thirteenth juror," in determining whether appellant was entitled to a new trial; and (2) whether, in the absence of an opportunity to hear from the witness directly, the trial court properly exercised discretion in denying the motion for new trial on the basis that the witness's testimony would not be credible.

Unlike my colleagues in the majority, I conclude that the relatively minor inconsistencies and weaknesses in the proffered testimony did not justify the prosecutor's denial of immunity on the ground that the government would be sanctioning perjury. Moreover, the prosecutor's refusal was unreasonable in light of the critical importance that the trial judge had ascribed to the witness and the limited and targeted nature of the request — only for the trial judge's consideration of the defense motion. As a consequence, the trial judge's denial of the new trial motion based on a determination that the proffered witness would not be believable, without ever having heard from the witness directly, was not based on a firm factual foundation and cannot be upheld. Therefore, I would reverse and remand the case for further consideration of the limited immunity request and new trial motion. On remand, the trial court should explore with all counsel whether the judge could hear from the witness while respecting his Fifth Amendment privilege and without unduly impinging on the government's legitimate interests. If possible, the trial judge should be permitted, under a limited grant of immunity to the witness tailored to the purposes of a new trial motion, to assess first-hand the testimony of this critical defense witness. If, after careful exploration of all the issues under the trial court's guidance, the government continues to refuse to grant limited immunity that will permit the trial court to do so, the trial judge must decide whether sanctioning the government is warranted under the circumstances.

The appeal also presents two legal issues that the conclusions of the majority allow it to sidestep. As I disagree with the majority's conclusions, I must address those legal issues as well. I would hold that the proffered defense witness was newly discovered for purposes of Rule 33 and that the *Carter* procedure applies in the context of a new trial motion.

I discuss first the conclusions in the majority opinion with which I disagree and then the legal issues the majority opinion does not address.

**I.      The Prosecutor's Refusal to Extend Limited Immunity to the Proffered Defense Witness for the Trial Judge's Benefit**

We established in *Carter* that where the trial court determines that the proposed testimony is "material, exculpatory, non-cumulative and unavailable from another source," and the prosecutor does not submit "a reasonable basis" for not affording use immunity to the crucial witness, the trial court may put the prosecutor to a choice "between dismissal of the indictment or some other commensurate remedy which the court may fashion on Sixth Amendment and due

process grounds, or affording use immunity to the crucial defense witness . . . ." 684 A.2d at 343.

*Carter* made clear that the decision to grant immunity is an executive function that lies with the prosecutor, *id*. at 338-39, but it also recognized that authority is abused if used to gain a tactical advantage and is not reasonably based on legitimate government interests, such as "considerations of potential future prosecution, an ongoing investigation, clear indications of potential perjury, or the excusable lack of information during the debriefing to make an informed decision." *Id*. at 342.

The point of *Carter* was to craft a procedure — "the carrot and stick approach," *id*. at 341 (quoting *United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir. 1992)) — that "would provide the trial court a means to balance the legitimate governmental interest with the defendant's Sixth Amendment right to compulsory process and Fifth Amendment right to due process of law by way of a fair trial." *Id*. at 335. *Carter* grounded its reasoning on "settled law that the government has a constitutional duty to volunteer exculpatory evidence to a criminal defendant," *id*. at 344 (citing *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667 (1985); and *United States v. Trevino*, 89 F.3d 187 (4th Cir. 1996)).

From this constitutional mandate, *Carter* derived "a related obligation to afford immunity to a crucial defense witness claiming the privilege against self-incrimination, so as to unlock the *exculpatory* testimony, always assuming the government can offer the trial judge no sound reason to withhold immunity from the particular witness." *Id*. Thus, the question of fairness to the defendant is to be weighed in determining the reasonableness of the government's decision to deny immunity to an exculpatory defense witness. This is not an inquiry into prosecutorial misconduct, but an assessment of the impact of the government's decision, i.e., whether without the evidence, there will be "a distortion of the fact-finding process." *Id*. at 344-45; *see Brady*, 373 U.S. at 87 (noting that a constitutional violation may occur "irrespective of the good faith or the bad faith of the prosecutor"); *Agurs*, 427 U.S. at 110 (noting that what is at issue is "the character of the evidence, not the character of the prosecutor").

### A. *"Sponsoring perjury"*

Here, the trial court determined that Odom's testimony was "material, exculpatory, non-cumulative, and unavailable from any other source," and that, if

believed, the testimony would result in acquittal.[1] Yet the government decided not to immunize Odom, asserting, as its sole concern, that it would be "sponsoring perjury."[2] Was this decision "reasonable" under *Carter*?[3]

*Carter* referred to "clear indications of potential perjury" or the "threat of blatant perjury . . . that is so apparent as to be demonstrable to the trial judge," *id*.

---

[1] The government does not dispute these determinations.

[2] The prosecutor stated that she believed "that by putting this witness on the stand [the government] would be sponsoring perjury." The prosecutor did not mention any of the other legitimate justifications that *Carter* identified: a pending investigation, insufficient basis to make a decision, or potential future prosecution.

[3] Since *Carter*, we have had very few cases raising the question whether the prosecutor's refusal to grant immunity was reasonable; the few cases that have presented the question were not close on the question. For example, in *Butler v. United States*, 890 A.2d 181, 189 (D.C. 2006), we upheld the trial court's decision not to sanction the government where the witness refused to be debriefed by the government, leaving the government without a basis upon which to make an informed decision. This was explicitly identified in *Carter* as a reasonable basis for declining to grant immunity. 684 A.2d at 342. Unlike in *Butler*, here the witness was debriefed. In *Ginyard v. United States*, 816 A.2d 21 (D.C. 2003), and *Bell v. United States*, 950 A.2d 56 (D.C. 2008), we affirmed the denial of motions for new trials where requests for *Carter* procedures were made. In *Ginyard*, we found that *Carter* was inapplicable because the proposed testimony was not that of a "proposed defense witness" as defendant "did not seek to present [his] testimony or ask the government to immunize [him] to enable him to be a defense witness," the testimony "would not have been materially exculpatory," nor was the evidence "unobtainable from any other source." 816 A.2d at 34. In *Bell*, we affirmed the trial court's decision not to conduct a *Carter* procedure because the proposed testimony was "not 'clearly exculpatory' of appellant." 950 A.2d at 63.

at 342, as a proper justification for the government to refuse immunity. This was the case, for example, in *United States v. Moore*, 651 F.3d 30, 81-82 (D.C. Cir. 2011), where the D.C. Circuit affirmed the District Court's determination that the government's refusal to immunize a defense witness for trial was reasonable and did not warrant sanction under *Carter* where the witness had given four wildly different stories about a murder, claiming first that he participated only in a robbery, then naming the murderer, then saying he was the murderer, and finally denying any involvement at all. The witness in *Moore* was clearly lying about an issue material to the prosecution.

Unlike in *Moore*, in this case the proffered defense witness did not make contradictory claims about the crime charged; to the contrary, Odom consistently said the gun and briefcase found in the backseat of appellant's car were his. Rather, the prosecutor cited nothing more than the everyday weaknesses in testimony routinely presented in criminal trials: minor inconsistencies and ambiguities in Odom's statements during the debriefing, his delay in coming forward, drug addiction and intoxication, and prior convictions. These weaknesses are inherent in the testimony of witnesses presented by the government in its case-in-chief in any number of cases where we have upheld convictions as supported by

proof beyond a reasonable doubt,[4] and do not implicate the government in "sponsoring perjury" as the prosecutor said it would be doing if it were to grant immunity to the defense witness in this case. If the government can present such testimony to satisfy its burden of proof beyond a reasonable doubt, is it fair to deny that opportunity to the defense, on a claim of "perjury," so that it can meet the much lower threshold of raising a reasonable doubt? Moreover, *Carter* could not have envisioned that the defense would proffer witnesses who were free from taint; indeed, it was concerned only with witnesses who are involved in wrongdoing, otherwise they would not have a Fifth Amendment privilege. The question is how much taint is too much and from whose perspective?

It is unnecessary to decide whether the prosecutor's use of the word "perjury" in this case or whether *Carter*'s use of the term were intended in the technical sense of that word. *See Gaffney v. United States*, 980 A.2d 1190, 1193 (D.C. 2009) (explaining that for perjury government must prove that the witness made "a false statement of material fact under oath with knowledge of its falsity").

---

[4] *See, e.g.*, *Fortune v. United States*, 59 A.3d 949, 960-61 (D.C. 2013) (noting that the sole government witness's criminal convictions and a history of drug use did not make her testimony "inherently incredible"); *Gibson v. United States*, 792 A.2d 1059, 1063 (D.C. 2002) (stating that jury could credit testimony of a government witness who had been drinking and smoking marijuana before the incident occurred).

What is obvious from the use of such a freighted term is the understandable concern that the government should not be penalized for declining to cloak with governmental immunity the testimony of a witness who would be deliberately lying about issues material to the offense. This is not a "necessarily imprecise standard," as the majority says. *Carter* purposely set a high bar and made clear that the prosecutor should not refuse to immunize an exculpatory witness simply because she does not think the witness's testimony would be credible before a jury. If the government believes a proffered defense witness who, as here, would completely exculpate the defendant, it would be obligated to discontinue the prosecution of the defendant. *Carter*, on the other hand, established the conditions to make it possible for the exculpating witness to be presented in the prosecution of the defendant.

Questions about witness credibility are "committed to the sole and sound discretion of the jury as determiners of fact." *Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986). Although *Carter* recognized "clear indications of potential perjury" as a legitimate basis for denying immunity, it cautioned that in deciding whether to grant immunity to a defense witness, the prosecutor may not "in effect usurp the usual jury function of judging credibility." 684 A.2d at 342. But that is what the prosecutor's reasons for refusing to immunize Odom amounted to in this

case, under the guise of the overheated rubric of "perjury." For example, the court accorded great significance to the prosecutor's argument that Odom "did not make himself known or available at the time of trial" and found that it "diminishes the credibility of his current assertion of facts enormously." The court also noted that, according to the prosecutor, Odom "stated basic facts about himself . . . either falsely or unknowingly incorrectly" such as "the number of kids he had," and when he had "last talked to any of the family members he was supposedly extremely close to." According to the trial court, this indicated "either a cognitive impairment or a truth impairment." The court discussed Odom's "crack haze," and said that he was "so drunk" on the night of the incident that "by definition his credibility as to anything he would testify about that night would be hugely impaired."[5] Relying on the government's proffer, the trial court picked out individual parts of what Odom had said in debriefing: that "he was dropped at Union Station rather than New York Avenue"; that according to the prosecutor, Odom said "there was *a* gun in the briefcase," (emphasis added) instead of admitting "that was *my* gun in the briefcase" (emphasis added); that Odom could

---

[5] The testimony at trial was that appellant and Odom had spent the night at a club playing pool and buying each other drinks. At the debriefing, Odom said he forgot to retrieve his briefcase from the backseat of appellant's car and a Burberry raincoat that he had placed in the trunk because he was drunk. However, there does not appear to have been any effort to quantify the amount of alcohol or other intoxicants Odom had consumed that night.

not say "what manufacturer of gun it was," and did not remember the marijuana in the briefcase.

In the Rule 33 hearing, defense counsel provided explanations for many of these inconsistencies. With respect to his absence from the first trial, Odom said during the debriefing that "he came forward because he was in recovery and it was his fourth step." Before then, he was on crack, jobless, homeless, and living on the streets.[6] Although a witness's delayed report to the authorities may be grounds for impeachment, it is not a disqualification nor does it make the witness's testimony inherently incredible. *See Morris v. United States*, 662 A.2d 111, 1125 (D.C. 1993). Many witnesses are understandably reluctant to testify at a criminal trial and this is even more so when that testimony would self-incriminate them in the

---

[6] The government put great weight on the alleged discrepancy as to whether Odom had entered drug treatment before the trial, or after. The trial was scheduled to begin on April 8, 2009, but did not actually take place until April 13 and concluded on April 15. The government stated that "Odom entered the drug program [at Avery Road] on April 27th," — after the trial — and claimed that Odom said he was admitted "on March 24th." Odom's lawyer, however, explained that "the first thing my client offered was that he was at Avery Road April 28th. Then he hedged and he wasn't sure . . . [but] he was accurate as to his initial guess as to when he started treatment." The medical records obtained by the prosecution confirmed Odom's initial recollection.

commission of a felony.[7]  The question is not whether the witness did not come forward before trial, but why, and whether the reason for his eventual decision to come forward would be credible to a jury.  Here, there were plausible and concrete explanations for Odom's absence at the time of trial and subsequent willingness to take responsibility as part of his recovery from drug addiction.  Even the impeaching prior convictions, which were mostly for drug offenses, corroborated Odom's statements that he had a been a crack addict for five years before he entered the drug treatment program that caused him to make the decision to come forward.

Defense counsel also argued that other alleged inconsistencies highlighted by the government were minor or merely discrepancies of the type that are grist for the jury's mill.  For example, the fact that Odom claimed he was dropped off at Union Station, while the government stated it was the New York Avenue Metro station (based on Nicole Smith's description at trial that he was dropped off at a "Metro station off of 5th and K") could have been "an honest mistake" by the intoxicated Odom because those two stations are a few blocks apart.  According to

---

[7]  Any impeachment of Odom for failing to come forward would be permissible "only where the circumstances are such that the witness's normal and natural course of conduct would have been to go to the authorities and furnish the exculpatory information." *Alexander v. United States*, 718 A.2d 137, 143 (D.C. 1998).

Odom's counsel, Odom was "hazy" about where he was dropped off. Odom's confusion might also be understandable in light of his explanation that because appellant had "the young lady in the front seat," "they changed plans on him," and instead of being given a ride home, as he had expected, they "kind of dropped him at Union Station." With respect to the number of children Odom had, the prosecutor proffered that Odom stated at the debriefing that he had two children. At the motions hearing, for the first time the prosecutor added that after subsequent investigation, the government determined "he actually has four," but did not offer any evidence in support of that assertion. Even though Odom was never asked about the two additional children the government claimed it discovered after the debriefing, the court accepted the prosecutor's statement and concluded that Odom had "either a cognitive impairment or a truth impairment such that he misstated the number of kids he had." That might have been an unfounded inference, however, as appellant explains in his brief on appeal that "Odom denies paternity of two of the children the government believes he sired." The trial judge did not know this, however, because Odom was not informed of the government's allegation or given a chance to explain.

These inconsistencies were, in any event, at most incidental to the primary question of guilt for possession of the gun in the briefcase. Odom maintained that

the briefcase, and the gun in it, were his. He never wavered. His claim was corroborated by other evidence. Odom stated that he forgot the briefcase in the backseat of appellant's car, consistent with the trial testimony of the officer who said that the briefcase was found in the back passenger compartment. Nicole Smith, the person who was a passenger in the front of appellant's car, testified at trial that she had seen Odom enter and leave the backseat of the car, but had not seen a briefcase, also consistent with the officer's testimony that the case was found right behind the front passenger seat, where Smith would not have seen it. Much was made by the prosecutor and the trial judge of the fact that Odom did not know the manufacturer of the gun. But he correctly identified it as a 9 mm and also correctly said that it was loaded, but not with a full clip. At trial, the officer who searched the car testified that there were eight rounds of ammunition in total. The gun was loaded with "six rounds in the chamber." Odom also said where he bought the gun and what he exchanged for it, see note 14 *infra*, and when he did so;[8] he said that he had first taken the ammunition out because he had tried to sell the gun, but then reloaded the gun. The prosecutor proffered that Odom said there

---

[8] Odom said that he bought the gun "about one month" before it was seized by the police on January 9, 2008. The government argues that Odom's assertion could not be right because he had been in jail until "mid-December" 2007. This is hairsplitting. Odom gave no specific date, but an approximation of "about" a month; the three-week period between mid-December and January 5 is "about" a month.

was "a" gun — rather than "my gun" — in the briefcase, and the trial court thought that formulation indicated that Odom was not fully claiming responsibility for the gun. But one must keep in mind that there was no transcript of the debriefing that captured Odom's exact words, and the prosecutor's account was disputed by Odom's counsel, who informed the court that Odom said the gun was "his." In this respect, Odom's signed and sworn affidavit also stated that "I left a briefcase in [appellant's] automobile," and that "in the briefcase was a gun and over 1000 pills."

In considering the government's justification for denying limited immunity to the witness, the trial judge's role was not to agree or disagree with the prosecutor's assessment of the witness's credibility. Nor is it our appellate role to agree or disagree with the trial judge in this respect. Assessing the credibility of the witness and the probable impact of the witness's testimony if presented at trial, was the issue for the trial court in ruling on the Rule 33 motion, but it was not properly the focus of the preliminary, and different, inquiry into the reasonableness of the prosecutor's refusal to immunize the witness, which denied the trial court the opportunity to hear and question Odom directly. At this first step, the relevant question was whether Odom's statements gave such "clear indications of potential perjury" that the trial judge should not even have to engage in the more nuanced

assessment of credibility appropriate to a Rule 33 inquiry. That was not the case here and "potential perjury" was not the basis for the trial court's determination that the government's decision not to extend immunity was reasonable. The prosecutor's and court's focus on factors that go to the ultimate question of credibility at trial (incidental inconsistencies, delay in coming forward, addiction and prior convictions) rather than on the standard established in *Carter* — clear indications of potential perjury — was misguided in light of Odom's clear admission that the gun in the briefcase was his — a statement that, if believed, exculpated appellant of the gun possession.[9] With a limited grant of immunity, many of the inconsistencies the prosecutor emphasized could have been explored and the court could have assessed first-hand whether they sufficed to defeat the motion for a new trial or should be for a jury to decide.

The majority draws attention to evidence tying appellant to the briefcase. Not only was the briefcase found in appellant's car, he "admitted it was his." A bullet matching those in the briefcase and in the chamber of the gun was found on the driver's side floorboard of appellant's car. The pills in the briefcase were green

---

[9] This was the only charge for which a new trial was sought. Appellant's drug convictions were supported by evidence of drugs (pills and marijuana) found on his person and in the trunk of his car. The drug convictions were not the subject of the new trial motion nor are they at issue on appeal.

and yellow, just like those found in appellant's pocket, and marijuana was recovered from the briefcase and the trunk of appellant's car.

Considered by itself, as it was at trial, this evidence is undeniably sufficient to convict appellant of owning the gun found in the briefcase. But the evidence was not as forceful as might appear at first blush. Evidence that appellant said that the briefcase was his came from an officer who arrested appellant. He testified that when he asked appellant to open the locked compartment of the briefcase, he refused, saying that the briefcase was his and that it contained naked pictures of his wife. But another officer on the scene, testifying about the same conversation, remembered appellant's claim that the briefcase contained naked pictures of his wife, but said nothing to indicate that appellant expressly claimed ownership of the briefcase. In addition, both officers' testimony was impeached by the fact that neither officer recorded what appellant said after the arrest.

The pills in appellant's front pocket were similar to some of those in the briefcase. The forensic chemist testified that appellant's pocket contained red and orange pills (both inert) and yellow and green pills (which contained MDMA). The briefcase also contained green and yellow pills, some inert, and others containing MDMA. But these facts do not mandate the inference that the briefcase

belonged to appellant.  Odom, who said he had taken over 1000 pills to the club to sell to a purchaser who did not show up, could  have given or sold some of the pills to appellant with whom he spent the night at the club, drinking and shooting pool. As for the marijuana found in the briefcase and the trunk of appellant's car, the forensic chemist testified that the contents of the two separate bags were commingled in the lab and tested together.  Thus, the record provides no evidence that the marijuana in appellant's trunk was the same type as that found in the briefcase, as the government conducted no test that would allow it to compare the two samples.  The jury did not have to decide whether appellant owned the pills and marijuana in the briefcase because appellant was charged with possessing the pills found in his pocket and marijuana in the trunk of his car, not those in the briefcase.

That was the evidence presented at trial. But the issue in this case does not pertain to the trial that was had but to how a new trial with the proffered defense witness would have been different.  Once the trial judge was informed of Odom's proffered testimony claiming the briefcase was his, in ruling on the motion for new trial the judge said "it may well be the case" that Odom put the briefcase in appellant's car; the judge thought Odom "actually might be credible" about owning the pills in the briefcase.  Although the trial judge did not say whether she credited

or discredited the officers' testimony about appellant's statements, we do know she did not give much weight to appellant's purported admission about the briefcase and did not rely on the officers' testimony or appellant's statement in ruling on the new trial motion — despite the prosecutor's urging that she do so. At a minimum, the trial judge struggled with the question of who the briefcase belonged to and did not assume that it belonged to appellant simply because officers testified that he said so when he was arrested. If the trial judge thought the evidence seen as a whole, including the proffered defense witness, supported Odom's claims to own the briefcase and the pills, the countervailing evidence in the government's case could not be compelling enough to provide a "clear indication" that Odom was lying. 684 A.2d at 342. And this is the relevant standard under *Carter*.

### B. The limited nature of the immunity requested

There is a second and distinctive aspect to evaluating the reasonableness of the prosecutor's refusal to immunize the witness in this case. Unlike in *Carter*, which involved a request for use immunity so that the defense could present an exculpatory witness to the jury at trial, in this case what was required from the government was much more limited in scope: a grant of immunity that would

permit the judge to assess Odom's credibility directly in order to decide the pending defense motion for a new trial.

The judge recognized that because the immunity requested was only for the motions hearing, it "presented a different calculus" than in the context of a request to present immunized testimony at a full-fledged trial.[10] The trial judge was undoubtedly correct, but what the judge missed is that the difference in the calculus favored the grant of limited immunity.[11]

The reasonableness of the prosecutor's decision not to immunize the witness has to be evaluated in the context of the purpose of the request and the scope of the requested immunity. Here, the purpose was to permit the judge to assess the

---

[10] The trial court stated during the motions hearing:

> What's happening here is that as a threshold matter, that witness isn't going to be able to testify in this hearing or isn't going to choose to testify in this hearing because he has a Fifth Amendment privilege.
>
> And so this is not trial testimony, this is motions hearing testimony.

[11] The trial judge's reluctance to explore the application of *Carter* in the setting of a motion for new trial might be explained by her own disapproval or discomfort with *Carter* and the procedure it established. ("*Carter* in and of itself is, I've always felt, way out there as an opinion.").

witness's credibility in deciding a motion for new trial pending before the court. As the witness had already been granted "letter immunity" for purposes of debriefing by the prosecutor,[12] what was required was an incremental extension of that immunity to include the judge under conditions tailored to the motion before the court. *Carter* also suggested that the court could consider hearing from the witness "*in camera*," 684 A.2d at 343 n.16, an option that would have allowed the judge to hear from the witness directly with a minimal extension of the letter immunity that had already been provided for the debriefing.[13]

Instead of extending Odom's immunity to allow the trial court to hear from Odom directly, the prosecutor proffered a narrative of Odom's statements to the judge, without a transcript, and offered her assessment that Odom was lying. The judge then asked Odom's counsel whether he had any disagreements with the

---

[12]  In its brief, the government represented that Odom received a letter granting him limited immunity for the debriefing. The letter is not in the record. At oral argument, government counsel said that she would consult with appellant's counsel about supplementing the record on appeal with the letter of immunity. The court has not received any supplementation of the record in this regard.

[13]  We have suggested a similar *in camera* procedure to allow the judge to determine whether information is *Brady* material. *See Boyd v. United States*, 908 A.2d 39, 61 (D.C. 2006) ("In arguable cases, the prosecutor should provide the potentially exculpatory information to the defense or, at the very least, make it available to the trial court for *in camera* inspection.").

prosecutor's proffer. His response indicated there were some discrepancies that could be significant on the question of credibility, including with respect to the important question of whether Odom was familiar with the gun in the briefcase.[14]

---

[14] The prosecutor stated that "Odom remembers a gun [in his briefcase], remembers that he has loaded it, doesn't remember the make or model of the gun, says that he normally carried a .45 Glock." However, reading from his notes and those of his assistant, Odom's counsel recounted that Odom said that he normally carried a 9 mm or .40, and that the gun in the briefcase was a 9 mm, but he could not remember the manufacturer. The gun the police found in the briefcase was a 9 mm SIG Sauer.

There were other inconsistencies in the accounts the trial judge heard from the prosecutor and Odom's counsel, both with respect to what Odom said and what questions he was asked. According to the prosecutor, Odom said that he had bought the gun "from some random guy at some random location, which he couldn't specify, for 300 packs of pills." Odom's counsel, however, reported that Odom said that he purchased the gun "on the street in Michigan Park" in exchange for "three packs of pills." He remembered taking the ammunition out of the gun because he wanted to resell it, and then reloading the gun.

According to the prosecutor, Odom had no explanation for how a bullet could have gotten on the floorboard of appellant's car. This appears to have been the prosecutor's inference from the fact that Odom said he did not open the briefcase in the car, as Odom's counsel reported that the prosecutor did not ask Odom about the bullet found loose in the car. With respect to the marijuana found in the briefcase, the prosecutor related that Odom "did not remember" the marijuana, but Odom's counsel said Odom was asked only whether he smoked marijuana, which he admitted to doing "regularly." According to Odom's counsel, there were "no further questions" by the prosecutor about the marijuana found in the briefcase, and Odom did not volunteer any statement in this regard. But the prosecutor replied that several times Odom had been asked whether there was "anything else" in the briefcase." These discrepancies were not reconciled. In considering the relevance of Odom's failure to mention the marijuana found in the briefcase, it is important to bear in mind that at trial the officer testified that there was "a little bit" of marijuana in the briefcase.

Lacking a transcript of the debriefing, the trial court had no definitive source about what Odom actually said, or what he was asked. Based on the narrative, the judge concurred with the prosecutor's assessment that Odom was lying.

It is difficult to understand why this roundabout, second-best procedure was reasonable under the circumstances. The importance of the proffered exculpatory testimony, the relatively minor nature of the weaknesses pointed out by the prosecutor, and the need for an accurate understanding of what the testimony would be, made it all the more important that the judge have direct access to the proffered witness. There was no obstacle, other than the prosecutor's refusal to extend the immunity it had already granted to Odom, for the court not to assess Odom's credibility based on direct observation. Odom was physically available during both dates of the motions hearing: he was in the courtroom when that hearing began on October 23, and he was "in the hallway" when it continued on December 11. And even if the prosecutor and the trial court thought there were questions about Odom's veracity, there was countervailing evidence of his bona fides as Odom had been willing to put his credibility on the line, offering to take a polygraph test.

Where the court determines that the refusal to grant immunity will unfairly "distort the fact-finding process," the trial court may decide that a sanction is warranted. *Carter*, 684 A.2d at 345.[15] That inference arguably could be justified where the proffered witness has been determined to be critical to acquittal in a new trial, the identified weaknesses in the witness's testimony are of garden variety, and the prosecutor could reasonably be expected to extend the immunity already granted to permit the trial judge to assess the witness's credibility directly. It is premature to make that ultimate determination at this juncture, however, because the matter has not been fully aired and considered under the correct legal standard. I would reverse and remand the case so that the trial court can re-assess Odom's proffered testimony for "clear indications of potential perjury." Then, using the "carrot and stick" approach envisioned in *Carter*, *id.* at 341, the trial judge should explore with all counsel whether some accommodation can be reached that would harmonize the defendant's constitutional rights and the government's legitimate interests in order to obtain the "immunity key to unlock exculpatory evidence from the defense witness," *id.* at 344, that the judge needs to assess to perform her judicial function in ruling on the motion for new trial. *See id.* at 350 (Ruiz, J., concurring) (noting that "where competing constitutional rights are asserted, it is

---

[15] During the motions hearing defense counsel made clear that he was not seeking any "sanction" against the government, only a new trial so that Odom could be presented as a defense witness.

the trial court's responsibility to avoid a conflict between them and to accommodate all of them, if at all possible," and that "all the participants at trial, under the guidance of the trial court, must actively attempt to find means around the problem.").

## II.  The Trial Court's Denial of the Motion for New Trial

Most of the same inconsistencies discussed above were cited by the trial judge in deciding to deny the motion for new trial on the ground that Odom's testimony would not be believable if presented at a new trial.[16]  The trial court also referred to three other items of evidence, as relevant for what they revealed about the credibility of Odom's claim to ownership of the gun.  Specifically, the trial court worried that Odom's statement that the gun in the briefcase he left in appellant's car was his did not address the stray bullet found on the floorboard of the car, because Odom had not opened the briefcase while he was in the car.  The

---

[16]  Our standard of review of the denial of a new trial motion is usually deferential, for abuse of discretion.  *See Prophet*, 707 A.2d at 777-78.  This is a reflection of the fact that the trial court, who has sat through the trial and observed the witnesses, has a superior evidentiary basis for decision.  *See Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573-74 (1985).  In this case, however, where the trial judge never had an opportunity to observe Odom testify, we are in the same position as the trial judge; we know just as much (or just as little) with respect to how his credibility would be judged if he were to take the stand.

court also found it telling that when Gregory Daniels, a friend of appellant, approached Odom days after the incident to ask Odom to own up to what was his, and asked about the Ecstasy pills in the briefcase, Odom reassured him the drugs weren't real but said nothing about the gun. The trial court also thought that appellant's comment during taped telephone calls made while he was in jail that "we're gonna put [the drugs and the gun] on Odom" undermined Odom's credibility. None of these questions would explain, however, why Odom would be willing to say the gun was his, even if he were granted some sort of limited or use immunity. The question for the judge was not whether there were any loose ends, but whether they were likely to outweigh Odom's admission before a jury that the gun was his.

In ruling on a new trial motion, the trial court must evaluate the proffered new evidence and decide whether it is "of such nature that in a new trial it would probably produce an acquittal." *Prophet v. United States*, 707 A.2d 775, 778 (D.C. 1998). In this case, the trial judge determined that, if believed, Odom's testimony would result in an acquittal. The only issue, therefore, was whether his testimony that the gun was his was believable to the point that it would raise a reasonable doubt in the mind of a jury about appellant's possession of the gun. In making this determination, the trial court "sit[s] as a thirteenth juror" — a reference to the fact-

finder's role in determining credibility and weighing the evidence. *Ingram v. United States*, 40 A.3d 293, 299 (D.C. 1983). For the trial judge to be able to sit as a thirteenth juror in this case, she had to be able to put herself in the position of a juror in a new trial who heard the witness. The trial judge did not dismiss Odom as an incredible witness; in fact, she thought "it may well be the case" that Odom put his briefcase and raincoat in appellant's car, and that Odom "actually . . . might be credible" about his ownership of the pills in the briefcase. But the judge was not convinced by his claim that the gun in the briefcase was his. There was no explanation, however, for how and when the gun would have found its way into Odom's briefcase, which was locked when the police seized it upon arresting appellant and his companion for drinking in the car. Under the circumstances, where so much was at stake on the resolution of that question, and the judge was informed of the witness's statements only through the filter of counsel and did not have an independent basis for assessing the witness's credibility, the judge was not in a position, as a thirteenth juror, to weigh its impact on the evidence as a whole.[17] As a result, the court's decision denying the motion for new trial, based only on the

---

[17] The trial judge commented that Odom's counsel and the prosecutor had proffered "what the witness's demeanor, recollections would be like." But except for the fact that Odom's recollections were described as a bit "hazy" on some points, there was no description of his demeanor.

proffer, on the ground that Odom would not be credible before a jury lacked a firm factual foundation.[18]

As I disagree with the majority that the trial judge's determination that the prosecutor's refusal to grant limited immunity to Odom was reasonable and denial of the motion for new trial without hearing from the witness on the ground that Odom would not be believable was proper, I turn to address two underlying legal issues that the majority avoids: whether Odom's testimony was "newly discovered" for purposes of Rule 33, and whether *Carter* applies in the context of a new trial motion. I conclude in the affirmative as to both.

### III. Newly Discovered Evidence

---

[18] There are cases in which "a trial court does not need to hold a hearing before ruling on a motion for new trial." *Geddie v. United States*, 663 A.2d 531, 534 (D.C. 1995) (citation omitted). However, in those cases, the trial court has either already heard directly from the witness during the trial and is in a position to evaluate a proffer of additional testimony (e.g., a recantation), or is able to decide that the new evidence, even if credited, would not have made a difference in the context of the trial as a whole. *See Ingram*, 40 A.3d at 901 (affirming denial of new trial motion where trial judge found "that the jury did not appear persuaded by similar testimony"); *Johnson v. United States*, 537 A.2d 555, 561-62 (D.C. 1988) (observing that two proposed witnesses had already testified at trial). This, however, is not such a case.

The government's leading contention on appeal is that we can affirm the trial court's denial of appellant's motion for new trial solely on the basis that Odom's proffered testimony was not "newly discovered" for purposes of Rule 33.[19] The government argues that "[w]here the substance of a non-testifying trial witness's testimony was known to the defense at trial, that witness's [subsequent] offer to testify does not qualify as newly discovered evidence."[20] I disagree with that categorical assertion. Rather, when, as in this case, evidence was not discoverable even though the defense has been diligent in trying to find and present the witness in time for trial, that witness's testimony, when proffered in a motion for new trial, is "newly discovered" for purposes of Rule 33.

---

[19] To obtain a new trial because of newly discovered evidence,

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*Prophet*, 707 A.2d at 77 (quoting *Thompson v. United States*, 188 F.2d 653 (D.C. Cir. 1951).

[20] The trial court concurred in this view, stating that "the evidence is not newly discovered, the body is newly discovered." The trial court reasoned, however, that even if the evidence had been newly discovered, appellant's motion failed because Odom's testimony would not be credible. As I have discussed in the previous section, the trial court's ruling cannot be upheld on that basis because it lacks a firm factual foundation.

The government relies on two cases from the United States Court of Appeals for the District of Columbia Circuit for the proposition that "the general rule in this Circuit has been that evidence known to the defendant at the time of trial does not qualify as newly discovered." *United States v. Gloster*, 185 F.3d 910, 914 (D.C. Cir. 1999) (citing *United States v. Ortiz,* 136 F.3d 161, 168 (D.C. Cir. 1998) ("The traditional definition of newly discovered evidence is evidence 'discovered since trial.'")). However, notwithstanding the "general rule" quoted in the government's brief, the cases cited are easily distinguished from this case. In *Gloster*, unlike in this case, the witness was never physically unavailable; rather the witness was known and at hand at the time of trial but claimed a Fifth Amendment privilege, and his written statement exculpating the defendant was admitted as a statement against penal interest. 185 F.3d at 912. Even more significantly, in both *Gloster* and *Ortiz,* the court's decision did not turn on whether the evidence was newly discovered because the proffered testimony failed several other prongs of the five-part test. [21] *See Gloster,* 185 F.3d at 915 ("[A]s in *Ortiz,* however, Gloster's claim fails so many parts of the [] test that we need not tarry over the first."); *Ortiz,* 136 F.3d at 168 (holding that "regardless of whether [the proposed witness's]

---

[21] The five-pronged test we use is the same as the D.C. Circuit's. See note 19, *supra*.

testimony is considered 'newly discovered' evidence, there is no basis to conclude that her testimony would have had any significant impact on the outcome of the trial given the nature of the government's other evidence").[22] Here, on the other hand, the trial court specifically found that three of the five *Prophet* elements were met: "there was no failure of diligence on the part of counsel in attempting to procure and subpoena the witness," "the evidence was not cumulative or impeaching merely," and "the evidence was highly material." *See* notes 16 and 17, *supra*.

---

[22] The government cites additional cases from other jurisdictions, which are also distinguishable. *See United States v. Lenz*, 577 F.3d 377, 379 (1st Cir. 2009) (holding that proposed testimony of victim, who was previously known and physically available but had not been called as a witness at trial on advice of her treating psychologist, was not newly discovered evidence); *United States v. Lofton*, 333 F.3d 874, 876 (8th Cir. 2003) (finding that proposed testimony of co-defendant was not newly discovered because defense knew relevant facts during trial, and thus could have called the co-defendant as a witness, and if the co-defendant invoked his privilege against self-incrimination, then the defense could have moved to sever his trial from his co-defendant, "which would have tested whether [the co-defendant's] unavailable testimony would deprive [the appellant] of a fair trial."); *United States v. Pierce*, 62 F.3d 818, 824-25 (6th Cir. 1995) (noting that proposed evidence was not newly discovered because it was known by the defense at the time of trial; the proffered testimony was "evasive, inconsistent and implausible"; the witness, who had testified at trial, "lied under oath several times"; and the defendant himself had testified that the proposed witness was "about as crazy a man as you'll ever meet").

This case is more similar to *Coates v. United States*, 174 F.2d 959 (D.C. Cir. 1949), and *Amos v. United States*, 218 F.2d 44 (D.C. Cir. 1954), decisions binding on this court,[23] where the District of Columbia Circuit reversed and remanded the cases for a new trial on the ground of newly discovered evidence even though the existence of the newly proffered witness was known at trial. In *Coates*, the defense proffered the testimony of a police officer who would have contradicted the complainant on a material issue. 174 F.2d at 959-60. Although the defense had known that an officer was a witness, he was not called to testify at trial. In a motion for a new trial, counsel for the defendant attached an affidavit detailing the efforts made prior to trial to identify and locate the witness. *Id.* at 959. The court held that the testimony of the policeman "was 'newly discovered' within the meaning of the rule," emphasizing, among other factors, that "[c]ounsel for the defendant certainly showed diligence in trying to ascertain it." *Id.* at 960. Similarly, in *Amos*, defense counsel had attempted to subpoena a witness whose testimony would corroborate the defendant's claim of self-defense, but defendant did not know how to spell the witness's name and he could not be located. 218 F.2d at 44. The court found that "it was no fault of the defendant or his counsel that [the witness] was not available at the trial," stating that even though the evidence would be cumulative of the defendant's testimony, a new trial should be

---

[23] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

granted where "a disinterested witness becomes available who can supply evidence of vital importance and the only similar evidence at the trial was that of the defendant himself." *Id.*

Other courts recognize that when a witness is known but unavailable to testify at the original trial notwithstanding the defense's efforts, her testimony "may [be] considered 'not previously available' for purposes of Rule 33. *Lenz*, 577 F.3d at 382; *see United States v. Purnell*, No. 97-4057, 1998 WL 405942, at *3 (4th Cir. June 9, 1998) (determining that testimony was newly available, even though witness was known, where defense counsel, despite diligent efforts, was unable to speak with witness until after trial and until that time "did not know how [witness] would testify); *United States v. Garland*, 991 F.2d 328, 335-36 (6th Cir. 1993) (finding that proffered testimony was newly discovered where defense knew of witness's existence, but could not locate witness after diligent attempts); *see also United States v. Ouimette*, 798 F.2d 47, 52 (2d Cir. 1986) (remanding for hearing on motion for new trial because court needed to make findings concerning reasons for defense witness's unavailability and counsel's efforts to locate witness).[24]

---

[24] Courts are split where the evidence proffered as newly discovered concerns the testimony of a co-defendant who has a Fifth Amendment privilege at

(continued . . .)

It makes no sense to adopt an all-or-nothing rule. The question whether evidence is "newly discovered" should turn on the facts of the case. In this case, as the trial court found, defense counsel, appellant, and Odom's brother had shown "extraordinary diligence" in trying to locate Odom before the trial. In addition, at the time of the motion for new trial, the court was presented with a plausible explanation for Odom's former unavailability and subsequent willingness to come forward. Under these circumstances, a determination that the proffered evidence was newly discovered would neither reward negligent preparation nor provide an incentive for "strategic" decisions to withhold evidence until after a verdict. I conclude that where the proposed witness was unavailable to testify at trial after a diligent search by the defense, the proffered testimony is "newly discovered" for purposes of a Rule 33 motion.

---

(. . . continued)

the time of the original trial. *Compare United States v. Jasin*, 280 F.3d 355, 364-65 (3d Cir. 2002) (discussing the majority rule that co-defendant statements are not newly discovered under Rule 33, citing cases from other jurisdictions, and commenting on the "inherently suspect" nature of "exculpatory testimony offered by codefendants after they have been sentenced"), *with United States v. Hernandez-Rodriguez*, 443 F.3d 138, 144 (1st Cir. 2006) ("This circuit has long held that exculpatory affidavits from co-defendants who exercised their Fifth Amendment privilege not to testify at trial may constitute 'newly discovered evidence' for Rule 33 purposes." (citations omitted)).

## IV.    *Carter* Applies in the Rule 33 Context

The government argued in the trial court and before this court that *Carter* has no application post-trial.  The government relies in part on language in *Carter* stating that the defendant is "required to raise this issue pretrial, else it might seriously derail the trial if raised after it commences."  684 A.2d at 345.  This admonition makes perfectly good sense where the defense has the witness ready to testify, as was the case in *Carter*, provided the requested immunity is granted.  But that may not always be the case and, as *Carter* also noted, the pretrial procedural requirement may be altered "for good cause."  *Id.*

It is obviously preferable, for the sake of good order and judicial efficiency, that *Carter* requests be presented as soon as possible, and before trial whenever feasible.  However, there is good cause to depart from that common-sense requirement in the case of new trial motions based on a newly discovered witness who has a Fifth Amendment privilege against self-incrimination.  As just discussed, appellant's motion for a new trial was based on the proffer of a witness the defense had diligently sought, but could not locate, before trial.  Importantly, the witness's testimony that the gun was his, if believed, would probably have led to appellant's acquittal of the gun charge.  Appellant's constitutional right to call

witnesses and present a defense to the trier of fact would be compromised if he were procedurally impeded, for reasons beyond his control, from invoking the trial court's consideration of his request for a new trial. Moreover, the pre-and post-trial distinction amounts to form over substance in this context, where the question is whether to grant a new trial. If the motion were granted, appellant's "post-trial" motion (after the first trial) would be tantamount to a "pretrial" request (before the second trial). What is significant is *when* the evidence became available to the defense. If it was newly discovered for purposes of Rule 33, the *Carter* procedure is available to enable the judge to rule on the motion on the merits. *Cf. Brown v. United States*, 934 A.2d 930, 937 (D.C. 2007) (rejecting request for witness immunity under *Carter* procedure made for first time on appeal).

The government also argues that *Carter* applies only for the purpose of presenting evidence at trial, based on *Carter*'s reliance on the Sixth Amendment right to present a defense. *See* 684 A.2d at 335-36. This also seems a formalistic distinction because the Sixth Amendment right would be implicated in a second trial, which is the focus of the new trial motion. Moreover, in *Carter* the court also based its reasoning on the trial court's and government's obligations to balance the defendant's Fifth Amendment right to due process of law "by way of a fair trial." *Id.* at 335, 342-44. In considering a new trial motion, the trial court implicitly

decides whether, in light of the new evidence proffered, fairness to the defendant requires that a jury decide guilt after hearing all the evidence. Thus, the *Carter* procedure is applicable in a Rule 33 motion hearing based on a newly discovered materially exculpatory witness who has a Fifth Amendment privilege.

\* \* \*

For the foregoing reasons, I would reverse the trial court's denial of the new trial motion and remand the case so that the trial judge may consider, in consultation with all counsel, options available that would permit the court to make a first-hand assessment of the credibility of the proffered exculpatory witness in a manner that would respect the witness's Fifth Amendment privilege, protect the legitimate interests of the government, and ensure fairness to the defense. The court can then make a properly informed decision on appellant's motion for a new trial.